# EXHIBIT 3

1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3         HONORABLE FERNANDO L. AENLLE-ROCHA

4        UNITED STATES DISTRICT JUDGE PRESIDING

5                    - - -

6
The Armand Hammer Foundation, Inc.,)
7                    PLAINTIFF,    )
                                   )
8   VS.                            )   NO. CV 22-08986 FLA
                                   )
9   Rex K. Alexander, et al.,      )
                    DEFENDANT,     )
10  _____)

11

12

13        REPORTER'S TRANSCRIPT OF PROCEEDINGS

14             LOS ANGELES, CALIFORNIA

15            FRIDAY, JANUARY 6, 2023

16

17

18    _____

19          KATIE E. THIBODEAUX, CSR 9858
            U.S. Official Court Reporter
20                 Suite 4311
              350 West 1st Street
21          Los Angeles, CA  90012

22

23

24

25

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR PLAINTIFF:

 4         REICKER PFAU PYLE AND MCROY LLP
           BY:  MEGHAN WOODSOME
 5         1421 State Street
           Suite B
 6         Santa Barbara, CA  93101

 7         -and-

 8         NELSON MULLINS RILEY AND SCARBOROUGH LLP
           BY:  RYAN E. COSGROVE
 9         19191 South Vermont Avenue
           Suite 900
10         Torrance, CA  90502

11         -and-

12         NELSON MULLINS RILEY AND SCARBOROUGH LLP:
           BY:  LUCAS A. WESTBY
13         -and- WADE MALONE
           201 - 17TH STREET NW
14         Suite 1700
           Atlanta, GA  30363
15

16

17    FOR DEFENDANT:

18         LAW OFFICE OF JEFF KATOFSKY
           BY:  JEFF CALL KATOFSKY
19         -and- MICHAEL HAYDEN LEFF
           4558 Sherman Oaks Avenue
20         Sherman Oaks, CA  91403

21

22

23

24

25
```

```
 1          LOS ANGELES, CALIFORNIA; FRIDAY, JANUARY 6, 2023

 2                          11:12 A.M.

 3                          - - - - -

 4

 5

 6

 7          THE CLERK:  Calling Item No. 2, LA CV 22-08986,

 8   the Armand Hammer Foundation, Inc., versus Rex K.

 9   Alexander, et al.

10               Counsel, make your appearances beginning with

11   the plaintiff.

12          MR. WESTBY:  Lucas Westby on behalf of the

13   plaintiff Armand Hammer Foundation, Inc.

14          MR. MALONE:  Wade Malone appearing pro hac vice

15   also for Armand Hammer Foundation.

16          MS. WOODSOME:  Good morning, your Honor.  Meghan

17   Woodsome also on behalf of plaintiff Armand Hammer

18   Foundation.

19          MR. COSGROVE:  Ryan Cosgrove also on behalf of

20   plaintiff.

21          MR. KATOFSKY:  Good morning, your Honor.  Jeff

22   Katofsky on behalf of defendant Rex Alexander.

23          MR. LEFF:  Good morning, your Honor.  Michael Leff

24   on behalf of defendant Rex Alexander.

25          THE COURT:  All right.  Good morning, everyone.
```

```
 1          We are here in connection with the Court's
 2   issuance of an order to show cause as to why a
 3   preliminary injunction should not be issued against
 4   defendants following the Court's issuance of an initial
 5   temporary restraining order.
 6          So I will take argument.  I will start with
 7   plaintiff since it is plaintiff's motion.  I am not sure
 8   which of you is going to argue.
 9      MR. WESTBY:  Again, Lucas Westby on behalf of
10   plaintiff, Your Honor.
11      THE COURT:  I have read the papers.  I will just
12   give each side an opportunity to tell me why I should or
13   should not grant the requested relief, and then I will
14   have a series of questions for each side.
15      MR. WESTBY:  Understood, your Honor.
16          And the Armand Hammer Foundation should be
17   granted a preliminary injunction for all the reasons set
18   forth in its brief, but really what I wanted to do this
19   morning is address the defendant's opposition papers
20   because those were filed most recently and we haven't had
21   a chance to do so yet.
22          As you know HF brought this action because it
23   was concerned about the specific actions of the
24   defendant.  Cancelling certain pledges, transferring
25   possession of artwork and assets belonging to AHF to
```

1    other entities, firing an AHF employee and prohibiting

2    board members from accessing the property.

3              Defendant's papers essentially say they have

4    done all those things.  They admit to those things.  Now,

5    they say they had a justification for doing them -- and I

6    will return to that thin justification momentarily -- but

7    for plaintiff, the opposition papers were illuminating

8    and showed that the situation was far worse than the

9    plaintiff thought, than we thought and that something was

10   greatly amiss.

11             They were illuminating, for example, because

12   on November 9th, defendants had sent cease-and-desist

13   letters to Rex Alexander and Mark Alfano, and there was

14   no response to those cease-and-desist letters.

15        THE COURT:  You said defendants sent.

16        MR. WESTBY:  I'm sorry.  Plaintiffs sent

17   cease-and-desist letters to defendants Alexander and

18   Alfano, and there was no response to those letters.  It

19   would have been an easy thing for them to respond and

20   say, well, actually, we are taking actions, we are

21   transferring assets on the authority of the Armand Hammer

22   Foundation board pursuant to a merger agreement executed

23   five years ago.  But they didn't.

24             Instead, they filed -- and we learned this, we

25   learned this in their papers filed on January 4th this

1    past Wednesday.  They filed a lawsuit in Florida on

2    November 11th, two days later, and the amended complaint

3    was attached to I believe it is Exhibit 4 of

4    Mr. Katofsky's affidavit.  It is an amended complaint

5    dated December 30, 2022.  We hadn't seen that complaint

6    before.

7         THE COURT:  Service had not been effectuated.

8         MR. WESTBY:  Service has not been effectuated, and

9    we have not been made aware of it at all.  Wednesday

10   night was the first time we had seen any art transfer

11   agreement.  I believe that is Exhibit 36 to

12   Mr. Alexander's declaration.  Nobody had ever told us

13   that AHF's art was being transferred to HIF.  It was all

14   done under the cover of night.

15        The only thing that we have been told at any

16   point was that some foundation art had been hanging in a

17   Santa Barbara museum purportedly to save the Armand

18   Hammer Foundation millions of dollars in taxes, and I

19   will talk about that a little bit more in a moment.  But

20   we have never seen a bill of sale for the Carpenteria

21   property that is at issue, and the bill of sale includes

22   all the possessions belonging to AHF inside that

23   building.  That was new.  That was something that had not

24   been shared with the plaintiff board members prior to

25   Wednesday night.

1          And, because, now, defendants admit they have

2     canceled pledges, transferred artwork and other assets

3     improperly, because they continued to deny board members

4     to AHF's digital property, but, most importantly, because

5     defendant's stated goal is to merge the Armand Hammer

6     Foundation out of existence, the TRO should be converted

7     to a preliminary injunction.  And this case is

8     existential now for AHF.

9          All of the actions taken to transfer AHF

10    property and assets were taken without notice of half the

11    board members who now constitute the majority of the AHF

12    board.

13         THE COURT:  So what authority did defendants have

14    to do any of these things?

15         MR. WESTBY:  None, Your Honor.

16         THE COURT:  On behalf of the foundation; right?

17         MR. WESTBY:  That's right.  None.

18         And that gets to likelihood of success on the

19    merits, and I want to address this idea that the 2017

20    merger agreement somehow authorizes the defendants to do

21    anything.  And this is a justification, again, that we

22    heard about for the first time on Wednesday night that

23    they are using this five-year-old merger agreement to

24    backfill and justify their actions this past fall,

25    actions that weren't disclosed to half the board.

```
1              So talking about the merger agreement which is
2    Exhibit 1 to Mr. Katofsky's declaration.  First of all,
3    the effective date of that merger agreement which
4    purported to merge AHF into Hammer International
5    Foundation, a Cayman Island corporation, was
6    December 31st, 2017.
7              Under paragraph 2, the merger was to be
8    effective midnight of that transfer date, and all of the
9    assets of the merging corporation, AHF, in 2017 were to
10   transfer to the surviving corporation, HIF, which was
11   going to take the name AHF at the time at midnight on
12   December 31, 2017.  That didn't happen.
13             Paragraph 3 of -- paragraph 3 of that
14   agreement required notice to be given to the California
15   attorney general 20 days before the effective date, and
16   we understand although the record has not been developed
17   on this point that the attorney general took issue with
18   the plans for the merger.
19             So the merger never happened on the effective
20   date.  The merger couldn't go forward.  It could not be
21   effected as written in the merger agreement.
22        THE COURT:  I noticed that the merger agreement
23   itself wasn't signed by all board members.
24             Does that matter?
25        MR. WESTBY:  I would have to look at the signature
```

1  pages again.  I think it very well could because the --
2  it didn't have the full authorization of the board.
3        THE COURT:  There was a vote taken, though; right?
4        MR. WESTBY:  Well, there was not a vote taken
5  actually.  If you read the meeting minutes prepared by
6  Rex Alexander, in November of, I'm sorry, December 4th, I
7  believe it was, 2017, the meeting minutes do not reflect
8  a vet or a resolution on that merger.  What it says is
9  that the board members have reviewed the merger
10 agreement.  And it was not a resolution that was to
11 effect the 2017 merger.  It was the merger agreement
12 itself.  And so it was done in the four corners of the
13 agreement.
14        It was not done by vote of the board.  And,
15 now, you can actually contrast that with the minutes that
16 were submitted for the November, 2020, board meeting that
17 authorized the 2021 merger into the Florida entity.  That
18 was done in the meeting and done by a vote of the board,
19 and it is actually spelled out in those meeting minutes
20 exactly how the board did that.
21        So there was not a vote.  The controlling
22 document is actually the merger agreement itself.
23        THE COURT:  I don't want to take you off your
24 presentation, but I did wonder about that.  If this
25 merger, this alleged merger had actually been

1    consummated, then why is AHF California merging into AHF

2    Florida?

3         MR. WESTBY:  That is exactly right.  So it was not

4    consummated.  The 2017 merger never happened.  And that

5    brings me to my second point.  The 2017 merger was agreed

6    to by a different AHF board for a predecessor different

7    California entity.

8         THE COURT:  That ceased to exist.

9         MR. WESTBY:  That ceased to exist.

10        THE COURT:  In 2020.

11        MR. WESTBY:  Exactly right.  As defendants

12   acknowledge, that entity merged into the Florida entity

13   and ceased to exist.  So at that point even if the merger

14   agreement was not already ineffectual after the effective

15   date when it said it would take effect, even if it was

16   still somehow possibly able to be resurrected, that all

17   ended when the California corporation ceased to exist.

18         And there is nothing in the four corners of

19   the merger agreement itself which is a contract that says

20   a Florida corporation is going to be merged into HIF.

21   And if the Armand Hammer Foundation board wanted to

22   resurrect that merger, they would have had to have taken

23   some action as a board.  They never did so, and there is

24   no evidence that the board of directors ever authorized

25   another merger.

1          Nobody ever came back to the AHF board to ask

2     if there was going to be another merger.  HIF never

3     submitted another merger agreement for contemplation.

4          THE COURT:  The California attorney general was

5     notified of the Florida merger?

6          MR. WESTBY:  My understanding is that's correct,

7     although, the record, again, has not been developed on

8     that point.  So I don't know if I have a record document

9     to point to on that, Your Honor.

10          And, at the same time, this idea that Rex

11     Alexander and -- that Rex Alexander and Mark Alfano had

12     sort of this blank check of authority based on a

13     five-year-old merger agreement that didn't happen for a

14     corporation that didn't exist is wrong.

15          THE COURT:  Are there any minutes of board

16     meetings authorizing them to take specific actions in

17     connection with that 2017 merger agreement?

18          MR. WESTBY:  Well, Your Honor, there are board

19     meetings, and they do authorize officers to take certain

20     actions.  Now, again, Alfano was not an officer at the

21     time.

22          THE COURT:  You mean the agreement itself or

23     minutes?

24          MR. WESTBY:  Minutes.  But the agreement itself

25     does not authorize officers to take actions on behalf of

1 the merger agreement that is, and the minutes only

2 authorize officers to take action on resolutions adopted

3 during that board meeting.  And, because it was not a

4 resolution and it was not a vote, it was a separate

5 agreement, they did not have authority to move forward

6 with -- it was not a resolution where they had authority

7 to act.

8    And I can -- and I can point you to the exact

9 spot in -- it is in the general approval which is

10 attached as Exhibit 30.  Exhibit 29 is the board

11 meetings, the board minutes themselves.

12    And defendants acknowledge that the officers

13 were authorized and directed to take all further action

14 they deem necessary, proper or advisable to carry out the

15 resolutions, and the minute does not reflect any

16 resolution or vote on the merger.  The minutes of that

17 day only reflect that the directors reviewed the merger

18 agreement.

19    And you can, again, compare and contrast this

20 to the minutes from the November 8, 2020 meeting where

21 they authorized the Florida merger into the Florida

22 corporation, and there is several paragraphs about the

23 presentation, the justification, the steps that would be

24 taken and then the vote.  And none of that is in the

25 December, 2017, meeting minutes.

```
 1              So, again, it is the four corners of the
 2    merger agreement that control, and there is therefore no
 3    authorization, that the board must be consulted under the
 4    bylaws and authorize certain actions to be taken.
 5         THE COURT:  I am looking at the minutes.  It is
 6    Exhibit 29 that you mentioned at Docket 33-33.  And what
 7    I see that it says, quote, each board member acknowledged
 8    that he had received and reviewed a copy of the Armand
 9    Hammer Foundation agreement merger.
10              Is there anything else?
11         MR. WESTBY:  That is all I have seen, Your Honor.
12              And if I can direct you to the 2020 meeting
13    minutes, and those are exhibits.  30 I believe.  I'm
14    sorry.  That's right.  I believe it is 32.  And you will
15    see a paragraph starting with attorney Randy Sterns, and
16    that takes, that walks through the justification for the
17    merger.  And I will let you --
18         THE COURT:  Yes.  That is at page 46 in the ECF
19    docket.
20         MR. WESTBY:  And, as it goes forward, it talks
21    about the justification.  It walks through the steps that
22    they intend to take, the documents that they intend to
23    file.  And then you will see upon motion by Viktor
24    Hammer, that merger is approved.
25              And I will give you a chance to take a look
```

```
 1   and ask any questions, but I do have another point while

 2   we are on this particular meeting to note here.

 3         THE COURT:  All right.  I have re-reviewed it.

 4         MR. WESTBY:  The other thing I want to note here

 5   is one of the arguments advanced in the defendants'

 6   papers is that this merger was necessary to effect a 2018

 7   merger, but nowhere in this passage does it say anything

 8   about the 2017 merger and nowhere have we seen a

 9   justification as to why exactly that would be the case.

10         But it specifically says here in these

11   minutes, again, which would have been prepared by the

12   secretary of the corporation, Rex Alexander, that it was

13   noted that Michael Hammer, having moved out of California

14   and no officers and directors currently living in

15   California, yada, yada, yada, as they say, and it goes on

16   to say the merger was being effected for the convenience

17   of Michael Hammer who was living in the Cayman Islands

18   and thought it would be easier to travel back to Florida

19   for foundation business.

20         It says nothing about the 2017 merger

21   agreement nor should it have because on its face that

22   merger agreement was already dead in the water.

23         THE COURT:  And Mr. Hammer at the time was one of

24   six board members and, what, the president?

25         MR. WESTBY:  He was the chairman and the president
```

1   I believe at that time.  I believe there were six.  There

2   may have only been five board members in 2020.  I

3   apologize for not knowing the answer to that.  But it

4   was, as I understand, unanimous approval in 2020 to merge

5   the California entity into the Florida entity, and thus

6   the California entity ceased to exist.

7        THE COURT:  Okay.

8        MR. WESTBY:  And this takes me back to the 2017

9   agreement, and one thing I just want to flag -- and it is

10  contemplated by most agreements like this -- but our

11  paragraph 9, the merger agreement can only be changed by

12  a written agreement signed by all the parties.  That

13  never happened either.

14        The 2017 merger agreement contemplated a 2017

15  merger.  It didn't happen.  There was no amendment, and

16  there certainly was no amendment in a written agreement

17  by all the parties.

18        Now, this gets us into another issue that

19  relates to the defendants' opposition papers and one of

20  their justifications for transferring AHF assets in

21  connection with this 2017 merger agreement.  And that

22  is -- and this is from paragraph 3 of Mr. Katofsky's

23  declaration.  He says that pursuant to the law of the

24  Cayman Islands, AHF must first be completely devoid of

25  any assets prior to the occurrence of the merger.

1           And that is a citation to Cayman Islands

2    Companies Act, Section 237(2)(g).  And I have copies of

3    that statute, and I am happy to share.  If I may

4    approach.

5           THE COURT:  You may.

6           MR. WESTBY:  This is the relevant section of the

7    Cayman Islands Companies Act.  If you turn to the second

8    page of this document, 237 starts on the first page, but

9    237(2) starts on the second page and starting at

10   subsection 2, it says:  Where the surviving or

11   consolidated company is to be a company existing under

12   this act, in addition to compliance by each constituent

13   company incorporated under this act with section 233(3)

14   through (10), the registrar is required to be satisfied

15   in respect of any constituent overseas company that --

16   and there are these various subsections.  And Section (g)

17   does not say the company, the merging company must be

18   devoid of all assets.

19           Section (g) says simply the constituent

20   overseas company will upon the merger or consolidation

21   becoming effective cease to be incorporated, registered

22   or exist under the laws of the relevant foreign

23   jurisdiction which is standard merger stuff that when the

24   merger becomes effective the merging corporation ceases

25   to exist.

1          And that is -- that certainly is not a

2    justification for transferring assets ahead of a merger.

3    Assets and liabilities should transfer on the merger as

4    the original merger agreement contemplated.  And so this

5    idea that there was some necessary reason for Mr. Alfano

6    and Mr. Alexander to transfer on the AHF board's

7    authority, they say, all of the AHF art, memorabilia,

8    assets, real property, that is fiction.  That is not in

9    this particular statute.

10          THE COURT:  On behalf of AHF Florida.

11          MR. WESTBY:  Well, and then they reported on

12   behalf of I guess AHF California.

13          THE COURT:  Which no longer existed.

14          MR. WESTBY:  And AHF Florida and the board of AHF

15   Florida had never come together to affirm that they were

16   going to take affirmative steps -- and to our knowledge

17   that is not in the record -- to authorize anybody to take

18   steps to effectuate a 2017 merger agreement.  And, even

19   had they done so, again, that was a specific contract.

20   They would have had to enter into another contract or

21   take some sort of board action to make that happen, and

22   that didn't happen.

23          But the other disturbing thing that we learned

24   in connection with this, the opposition papers, and this

25   comes from the December 30, 2022, amended complaint that

1    was attached I believe, again, as Exhibit 4 to

2    Mr. Katofsky's declaration.

3           THE COURT:  This is the Florida action?

4           MR. WESTBY:  This is the Florida action.  There

5    are actually two Florida actions.  One is HIF purports to

6    bring against Viktor Hammer and Morgan Stanley.  We were

7    aware of that action, and Viktor Hammer was served with

8    that action.  So that is going to proceed in some form or

9    fashion.

10          THE COURT:  That is in the same place?

11          MR. WESTBY:  They are both in Broward County, yes,

12   Your Honor.

13          Now, that complaint and I would urge you to

14   look at paragraph 59 to 68 of that amended complaint

15   because it spells out the actions that the defendants

16   were taking at the very same time they were transferring

17   assets out of Armand Hammer Foundation or claiming that

18   they were transferring assets.  We would dispute that the

19   asset transfers are valid because they didn't have board

20   authority, but at the same time they were purporting to

21   transfer Armand Hammer Foundation assets to the Hammer

22   International Foundation, they were taking steps to take

23   over the Hammer International Foundation.

24          Paragraph 59 of that complaint says at a

25   special meeting of HIF's board on September 16th, fall of

1   2022, Michael Hammer thus appointed Rex Alexander who had

2   been an outside independent director of HIF, whatever

3   that means, as Michael Hammer's indefinite proxy

4   director, whatever that means, for HIF.

5           It goes on to say that Michael Hammer also --

6       THE COURT:  Is any of that in the HIF -- do we

7   have the HIF bylaws?

8       MR. WESTBY:  They are not part of the record, and

9   that is not something that we have or at least that we

10  know we have that is current.

11      THE COURT:  Just wondering if there is any

12  authority for any such thing, a proxy of indefinite

13  duration for a board member to act.

14      MR. WESTBY:  I have never heard of such a thing

15  and issued by someone who was at this point very, very

16  ill with glioblastoma.  In the same paragraph, Michael

17  Hammer purports to make Mark Alfano the president and

18  designated representative of the only other director of

19  the Hammer International Foundation which is an entity

20  called Samuel 1 Ltd.  So there were two directors as we

21  understand it of the Hammer International Foundation,

22  Michael Hammer, and this entity Samuel 1 Limited.

23          According to their allegations in the

24  complaint in September, they make -- Michael Hammer made

25  Rex Alexander the indefinite proxy director for Hammer

```
 1    International Foundation and Alfano the president and
 2    designated representative for Samuel 1 Limited.  And so
 3    they then go on -- and at the time Armand Hammer
 4    Foundation was the sole member of the Hammer
 5    International Foundation.
 6           So they then allege that AHF is the sole
 7    member.  Samuel 1, Mark Alfano and Rex Alexander are the
 8    new directors.  They then call a special meeting and
 9    appoint Misty Hammer as HIF's president and chair -- this
10    is September 16, 2022, in their own allegations, in their
11    own words -- Rex Alexander, HIF's vice president and
12    secretary and Mark Alfano as HIF's treasurer.
13           They then say they are going to switch
14    accounts from Morgan Stanley and move the money alleging
15    that Viktor Hammer made some bad acts, whatever those
16    might be and then say on November 1 with the board
17    constituted as it was, they then elect more directors.
18           So Rex Alexander as the alternate proxy of
19    Michael Hammer -- and this is paragraph 65 of the amended
20    complaints -- Mark Alfano as president of Samuel 1
21    Limited, Mr. Katofsky is elected to the board of
22    directors in mid November.
23           THE COURT:  Counsel?
24           MR. WESTBY:  Counsel.  I'm sorry.  On November 1.
25    Counsel is elected.
```

 1          THE COURT:  For all defendants in this case;

 2    right?

 3          MR. WESTBY:  Correct.  This is paragraph 65 of the

 4    amended complaint.  Mark Alfano individually so not on

 5    behalf of Samuel 1 but individually, Rex Alexander

 6    individually.  So he is elected now individually to the

 7    board.  And, again, Misty Hammer and a new name that they

 8    were unfamiliar with Rocia Park.

 9          They then also appoint new members because at

10    that time AHF was the only member.  So they appoint new

11    members, and those new members are Mr. Katofsky, Mark

12    Alfano, Rex Alexander and Misty Hammer.  And, Your Honor,

13    the first time we learned about this was Wednesday night.

14          Now, going back to the elements --

15          THE COURT:  When you say the first time you

16    learned about this --

17          MR. WESTBY:  This had not been disclosed to AHF's

18    board members.

19          THE COURT:  But what you are reading to me is from

20    the complaint?

21          MR. WESTBY:  This is from the December 30 amended

22    complaint that had not been served even though that

23    action had been initiated on November 11th, two days

24    after we sent the cease-and-desist letters.  We knew

25    nothing about it until it showed up as an exhibit to a

1   declaration in a filing on Wednesday night.

2        And that is true of a lot of the documents.

3   As I mentioned, the art transfer agreement, the document

4   purporting to transfer -- the bill of sale for the

5   Carpenteria property and everything inside of it

6   belonging to AHF.

7        Even though the plaintiff board members had

8   been making requests for information, asking for

9   inventories, asking what had happened if any art had been

10   transferred.  The only thing we had been told was that

11   foundation art which we now understand and it was in the

12   correspondence from Mr. Katofsky says Foundation art was

13   put on loan to the Santa Barbara museum to save AHF

14   millions of dollars in taxes.

15        But, according to their opposition papers --

16   and we didn't know this again until Wednesday night --

17   they had transferred that art to the Hammer International

18   Foundation before it went on loan.  Again, I am not a

19   Cayman Islands attorney --

20      THE COURT:  That was back in -- when would that

21   have happened?

22      MR. WESTBY:  I will have to check.  The date of

23   the art transfer --

24      THE COURT:  Is that part of the transfer of the

25   California property, the Carpenteria property or

1    separate?

2         MR. WESTBY:  There is a separate art transfer

3    agreement.  I believe it is Exhibit 48 to

4    Mr. Alexander's --

5         THE COURT:  My memory of the transfer of the

6    California property is October; right?

7         MR. WESTBY:  October 27th I believe, and it is the

8    same date.  October 27th.  And that is ECF 3340 is our

9    transfer agreement.  So based on correspondence with

10   defendant's counsel, we sniffed out the deed from the

11   recorder's court.  There is also a bill of sale attached

12   to the Carpenteria property, and that is the very next

13   exhibit, Exhibit 49.

14        THE COURT:  Before we get off the art transfer

15   agreement, this is the art transfer agreement that is

16   transferring all of the art that belongs to the Armand

17   Hammer Foundation to HIF?

18        MR. WESTBY:  Correct, Your Honor, and that was

19   not --

20        THE COURT:  For $10; right?  That is what the

21   document says?  Consideration paid for all this art was

22   $10?

23        MR. WESTBY:  Your Honor, I am not sure there is

24   consideration paid for the art.  The $10 relates to the

25   bill of sale for the Carpenteria property I believe.

```
 1          THE COURT:  I see.
 2          MR. WESTBY:  And the bill of sale for the
 3   Carpenteria property is Exhibit 3341, and attached to
 4   that bill of sale is an itemized list of the different
 5   assets that purportedly belong to the AHF that are being
 6   transferred to HIF that are inside the actual property.
 7             And going back to my original point if I may
 8   because it shows up in the opposition brief that the art
 9   went on loan to the Santa Barbara museum to somehow
10   convey a tax benefit on the Armand Hammer Foundation even
11   though it belonged, according to defendants, to the
12   Hammer International Foundation, that just doesn't make
13   sense to us.
14             I am not a Cayman Islands lawyer.  I am not a
15   tax attorney, but I don't get to make a donation and my
16   brother get to take the tax credit for it.  So I don't
17   know how HIF can purport to loan its artwork to the Santa
18   Barbara museum and somehow it inures to a tax benefit
19   from AHF under the circumstances as presented by
20   defendants.
21          THE COURT:  Well, AHF is a 501(c)(3) corporation;
22   right?  That is exempt from tax, is it not?
23          MR. WESTBY:  I don't understand the nuances.  This
24   is the representation that is being made in the
25   defendant's opposition papers.
```

```
 1            THE COURT:  Yes.  I am just asking you, AHF is a
 2   501(c)(3) entity?
 3            MR. WESTBY:  Yes, Your Honor.
 4            THE COURT:  Thus exempt from tax.
 5            MR. WESTBY:  As it has been explained to us by
 6   defendants that there are certain taxable assets that if
 7   they are not, for example, put on loan with the Santa
 8   Barbara museum, there could be a tax implication there.
 9            THE COURT:  What is the authority for that?
10            MR. WESTBY:  We have not seen one.  This is the
11   justification provided to us by defendants and being
12   offered in their opposition papers.  This is not me
13   standing before you telling you this is fact, Your Honor.
14   This is what they have been telling us, that by HIF
15   loaning HIF artworks, there is somehow a tax benefit to
16   AHF.  And I will leave it to defendant's counsel to
17   articulate exactly how and why.
18            THE COURT:  The art transfer agreement itself
19   lists, it looks like 32 pieces of art.  Are they all on
20   loan to the Santa Barbara museum?
21            MR. WESTBY:  Our understanding, and, again, this
22   is based on representations made by defendant's counsel,
23   but only eight pieces are on loan to the Santa Barbara
24   museum.
25            THE COURT:  Where are the rest?
```

1          MR. WESTBY:  We don't know, Your Honor.  We have

2     now -- with the TRO, we have now gotten access to the

3     Carpenteria property.  And we are going to get an

4     independent firm of some kind or party of some kind to

5     take an inventory so we can understand what we are

6     dealing with.

7          But we had to get access.  Dave Smith is the

8     only person who has knowledge of what was in there

9     before, but even that knowledge isn't perfect so we are

10     going to take an inventory.  That is what we have to do

11     in this litigation, Your Honor, is sort out what has been

12     taken, what is where and who it belongs to.

13          And standing here today, it belongs to AHF.

14     None of the transfers were authorized by the board.  And

15     this thin backfill of a premise that somehow this 2017

16     merger agreement gave defendants authorization to

17     transfer these artworks to an entity that they at the

18     same time were taking control of which is going to be a

19     separate issue but that they were taking control of

20     doesn't hold water.  And therein lies -- I mean, there

21     are breaches of fiduciary duty because these are officers

22     of the Armand Hammer Foundation.

23          And they are purporting to self deal to the

24     Hammer International Foundation.  So going back to

25     likelihood of success on the merits, that goes straight

1  to the breach of fiduciary duty claims.

2         Now, I think based on what we have seen in the

3  defendant's papers, we are going to have to amend.  But

4  as the document is currently pleaded, there is a

5  likelihood of success on the merits that AHF is going to

6  succeed in this lawsuit.

7      THE COURT:  What is the state of service with

8  respect to your complaint?

9      MR. WESTBY:  We have served Mr. Alexander.  We

10  believe the other two defendants are evading service.  We

11  have had multiple process servers attempt to serve the

12  defendants in multiple locations including their homes,

13  and they are often locked out.  Mr. Alfano, for example,

14  lives in a gated home or gated community as it may be,

15  and our process servers believe that they are evading

16  service.

17         And we have, I think, at this point attempted

18  service by mail on Mr. Alfano in Bull Canyon.  And if we

19  haven't already on Misty, we are doing so.  We are

20  preparing the papers and getting those out as we speak.

21  We have had process servers indicate that they think they

22  made service on Misty Hammer, but we have not been able

23  to confirm.

24      THE COURT:  And would you mind addressing the I

25  think it is the November, 2020, minutes in connection

1    with the merger that we touched on between the merger of

2    the California entity with the Florida entity and the

3    reasons for it.

4            I know we are not here today on your motion to

5    remand, but if you could address the question of the

6    Court's jurisdiction to issue a preliminary injunction

7    while the question of jurisdiction -- Mr. Alexander is

8    challenging the Court's personal jurisdiction over him,

9    and you are challenging, your client is challenging the

10   Court's subject matter jurisdiction over the action in

11   general.

12           So if you could just address that, obviously,

13   in the context of my authority to issue a preliminary

14   injunction and take into consideration the

15   representations or the statements, the evidence if you

16   will that is set forth in the November, 2020, minutes and

17   what it says or how it speaks to the corporation's nerve

18   center once it becomes a Florida company, its principal

19   place of business.

20           MR. WESTBY:  Yes, Your Honor.

21           And so there was a lot in that question, and I

22   will start with the issue of remand and subject matter

23   jurisdiction.  While we would be more than happy to stay

24   in this court, we feel that this case has finally

25   progressed.  We think that -- and we felt it incumbent

1    upon us to provide the Court with the facts about the

2    nerve center of the business.

3         And I think even in light of the 2020 minutes

4    indicating that an office would open in Florida, as we

5    understand it, that is a virtual office only.  And as the

6    opposition papers even concede, the Carpenteria office

7    remained where all the property was, where all the assets

8    were, where the sole employee, Dave Smith, worked.  And

9    that is the true nerve center of the business.

10        Now, again, if the Court were to find that

11   this gives rise to subject matter jurisdiction, we would

12   be perfectly happy staying in federal court.  But we want

13   to make sure that our client is protected and that

14   whatever decisions issue in this Court can't later be

15   undone by the defendants if they turn around and later

16   claim there is no subject matter jurisdiction.

17        Well, they removed it, but subject matter

18   jurisdiction can be addressed sua sponte at any time.

19   And one of the issues they bring up in their response to

20   the remand -- and I believe our reply brief is due

21   today -- but one of the issues is this idea that we made

22   an admission in judicio in our complaint that we have a

23   principal place of business in Florida.

24        And while our reply brief will reflect that is

25   supposed to be a discussion about the state of

1    incorporation, and it was a typist error and that is

2    fine.  It doesn't matter.  The fact remains an admission

3    in judicio doesn't apply.  You can't waive subject matter

4    jurisdiction.  And so, again, if the Court finds based on

5    this that it has subject matter jurisdiction, great.

6         THE COURT:  It is evidence, is it not?  Obviously,

7    the defendants or at least one defendant removed the

8    action, and we have minutes that certainly suggest that

9    the company is moving itself; right?  The foundation is

10   moving itself from California to Florida.  There are all

11   these justifications for it that are set forth in the

12   minutes.  So that certainly constitutes evidence, and I

13   am assuming the defendant removed it in good faith.

14        MR. WESTBY:  And, again, if this case does not get

15   remanded, we are certainly fine with that, but we do have

16   a duty of candor with the Court, and the duty of candor

17   includes making the Court aware of the facts of the

18   Carpenteria location essentially serving as the nerve

19   center which is the test for principal place of business

20   and that the nerve center has until the present remained

21   in Carpenteria, California.

22        THE COURT:  So the facts are that the Carpenteria

23   property, of course, is in Carpenteria, California;

24   right?  And tell me about that property.  What is it, and

25   what went on there?  Is it someone's home?  Was it an

1    office?  A commercial space?  What is it?

2         MR. WESTBY:  As I understand it, it is a warehouse

3    space that also serves as the primary office for the

4    Armand Hammer Foundation.  I believe it also has an

5    apartment where Michael Hammer stayed even as recently as

6    2022.

7         THE COURT:  Even though he had moved to the Cayman

8    Islands?

9         MR. WESTBY:  As I understand it, again, and this

10   is not developed in the record right now, but Michael

11   Hammer moved back to California to receive treatment for

12   his illness and has been in California for most of 2022

13   and died in California.

14        THE COURT:  I see.

15        MR. WESTBY:  Now, if additional discovery on the

16   issue of subject matter jurisdiction would be helpful, we

17   can do that and proceed in this Court until that issue

18   has been decided.  What we were concerned about, frankly,

19   is that the motion for remand was done knowing that the

20   nerve center was in Carpenteria, and it was done to --

21        THE COURT:  Two days before the TRO was set to be

22   heard in state court.  I understand.

23        MR. WESTBY:  Correct.

24        THE COURT:  So it is a warehouse with an office,

25   and then you said there was one employee?  Is that the

1    extent of the staff that worked for the foundation?

2         MR. WESTBY:  That is the extent of the employees

3    as I understand it.  Dave Smith was the sole employee for

4    the foundation.

5         THE COURT:  And he was based in California.

6         MR. WESTBY:  Correct.  And I am happy to answer

7    more questions about this likelihood of success on the

8    merits.

9         And I apologize.  You asked about the personal

10   jurisdiction argument, and that will be briefed and we

11   think that the defendant's opposition papers provide

12   plenty of contacts with California sufficient for Rex

13   Alexander for this Court to have personal jurisdiction

14   over Mr. Alexander.

15        So I believe our response brief to that is due

16   next Friday, and we will brief that as well.

17        THE COURT:  I think Mr. Alexander played some role

18   in the quitclaim deed?

19        MR. WESTBY:  That's correct.

20        THE COURT:  And what would be the effect of that

21   quitclaim deed that was done without board authorization?

22        MR. WESTBY:  It would be ineffective.  Because it

23   was not authorized by the owner, the Armand Hammer

24   Foundation, to be executed, it is without authorization.

25        THE COURT:  It was not done without board

1   approval?

2        MR. WESTBY:  It was not done without board

3   approval which means there was no authority for the

4   quitclaim deed to be executed by Mr. Alfano and

5   Mr. Alexander.

6        THE COURT:  And the property is held in the name

7   of the foundation?

8        MR. WESTBY:  The property was held in the name of

9   the Armand Hammer Foundation.

10        And I am happy to continue to address --

11        THE COURT:  Is there anything else that you would

12   like to --

13        MR. WESTBY:  I would like to touch briefly on the

14   other elements of the preliminary injunction, and I want

15   to talk briefly about and turn now to irreparable harm.

16        So defendants now have admitted to

17   transferring a number of one-of-a-kind, unique pieces of

18   priceless art.  There is a Degas that I am aware of.

19   There is a Renoir that I am aware of.  Some of the most

20   recognized artists in art history.  And these are

21   one-of-a-kind pieces.  These are not widgets that can be

22   recreated and damages can be awarded and new widgets can

23   be purchased.  Once these are gone, they are gone.

24        THE COURT:  Any idea what the value of the art is?

25   Can you value it?

```
 1        MR. WESTBY:  No, Your Honor.  I don't know the

 2   value of the art, and we would argue that the art is

 3   priceless.  And that, again, because of its unique

 4   nature, there is no value to the art.

 5        THE COURT:  I mean the possession and the

 6   exhibition of the art goes to the purpose -- right -- the

 7   charitable, educational purpose of the foundation.  That

 8   is why it owns it, presumably, exhibits it?

 9        MR. WESTBY:  That is correct, and it does go to

10   the purposes in the bylaws of the foundation, but also,

11   and this is where sort of the irreparable harm really

12   grows, and I made a reference to this when we were

13   talking about the Cayman Islands statute and ceasing to

14   exist.  But, if a preliminary injunction doesn't issue

15   here and the defendants are allowed to just proceed to

16   transfer assets and, you know, and execute and effectuate

17   this merger that they claim to be trying to effectuate,

18   it would merge AHF out of business completely.

19             And so this is about AHF's existence.  It is,

20   by its very nature, irreparable.  It is not capable of

21   being calculated.  It is about retaining employees.  It

22   is about loss of goodwill, and it is about loss of

23   reputation because we can't make payments but it is also

24   about the very existence of the company.

25             So we would argue that the harm is incredibly
```

1    irreparable and that we satisfy that element.

2          THE COURT:  What is the state of compliance with

3    the temporary restraining order I issued?

4          MR. WESTBY:  I am glad you asked.  So when our

5    clients asked Mike McGrew and Dave Smith to take

6    possession of the Carpenteria location and go there and

7    to change the locks and figure out what is in there and

8    what is going on, Dave Smith was in Utah.  He was out of

9    town for the holidays.  So he had to come back from Utah.

10          But Mike McGrew went to the police as we

11    understand it, showed them your order, and they gave him

12    authority to go back to the premises.  When we informed

13    defense counsel that he was headed there, we were told he

14    had no authority whatsoever to be there and that the

15    property didn't belong to the Armand Hammer foundation.

16          THE COURT:  Told by whom?

17          MR. WESTBY:  Mr. Katofsky, Your Honor.

18          THE COURT:  Counsel?

19          MR. WESTBY:  Counsel.  And that was the first we

20    heard of that, and that is why we started sniffing

21    around.  And that is how we found the deed purporting to

22    transfer the property which we attached to our motion for

23    preliminary injunction.  Had we known about that we would

24    have attached it to our TRO, but we didn't.  And we are

25    learning new facts all the time, and that is one of the

1   problems.

2          We have also asked for access to the computers

3   and electronic systems so we can get an inventory on our

4   own so we can understand what has been happening for the

5   last several months.  And we have been told that is not

6   AHF property any longer and we are not to access those

7   systems because, according to defendants, they have

8   transferred that to HIF.

9          So we cannot access the computers.  We cannot

10  access the security system.  We can not access Outlook

11  365 which we think is the system that was being used.  We

12  don't have any of the passwords.  We don't have any of

13  the administrative credentials.  We can't access the

14  cloud back up system for those systems.  We can't access

15  any of it.

16         We also, as I understand it, Morgan Stanley is

17  not allowing AHF to access any funds in the accounts

18  because they need to see an order that authorizes the

19  foundation to access those funds, and that is one of the

20  requests for relief we are making today is allow the

21  foundation access to its funds so it can pay Dave Smith

22  to be an employee, so it can pay its obligations to the

23  different charities that it has made obligations to and

24  do some of the things that AHF intends to do.

25         THE COURT:  That was not in the restraining order.

1          MR. WESTBY:  That is not in the restraining order.

2     That is relief we requested when we filed our

3     supplemental brief.

4          THE COURT:  Was it in the proposed order that you

5     submitted to the Court in connection with your request

6     for a preliminary injunction?

7          MR. WESTBY:  I believe so.  I don't have the

8     proposed order in front of me, but the motion for

9     preliminary injunction requests that this Court provide

10    access passwords and administrative rights to all bank

11    accounts, computers, e-mail systems and electronic

12    databases, and we list the ones that we know about right

13    now.  There may be others.

14          And we seek the return of all AHF artwork and

15    AHF property and assets recently transferred, moved or

16    otherwise taken by the defendants or in the alternative

17    an inventory of everything that has been transferred or

18    taken and in order for the defendants to secure all the

19    property and then an order confirming the right for

20    Viktor Hammer, Pete Sansone and Jim Frazier to act on

21    behalf of, control and bind AHF in addition to converting

22    the TRO as presently written to a preliminary injunction.

23          And from there -- and we recognize, again,

24    that a mandatory injunction requires a great burden and

25    requires us to meet an extraordinary burden, but, again,

1    we are -- the defendants are trying to merge AHF out of

2    existence.  And they are now in control of assets that

3    were not properly authorized to be transferred that they

4    took under cover of night.  They are in the possession of

5    those assets wherever they may be, and those need to be

6    returned.

7          Now, some may still be in the property.

8    Again, that is something we are working to determine.

9    Dave Smith like I said was in Utah.  He just got back,

10   and we are looking to get an inventory done of the

11   property inside the Carpenteria building.  But we know

12   not everything is there and wherever those -- some of the

13   memorabilia, for example, we know is missing.  Wherever

14   that is, we seek an order securing it, returning it but

15   at a minimum securing it.

16        THE COURT:  You ask for a receiver in lieu of an

17   injunction if I were to deny the request for the

18   injunction.  Regardless of whether I grant it or deny it,

19   would an independent receiver be of any value?

20        MR. WESTBY:  An independent receiver would be a

21   referee and someone who could do the things that we need

22   to do, take inventories, understand the assets that have

23   been moved in recent months, understand what has happened

24   in certain accounts, access the e-mail systems and the

25   electronic systems and the computers and take forensic

1    images of those things, all the things that we as a party

2    would do should a preliminary injunction and a

3    preliminary injunction should issue, but, at a minimum as

4    a fall back, this property can't remain with the

5    defendants for the reasons that we have argued in our

6    papers and here today.

7         THE COURT:  Are you requesting an injunction and a

8    receiver to be appointed or just the injunction?

9         MR. WESTBY:  We are requesting an injunction or in

10   the alternative the appointment of a receiver, Your

11   Honor.  Our number one priority right now is securing

12   everything, and, then, the parties can litigate over what

13   goes where and the effect of the 2017 merger agreement

14   and whatever else the parties need to litigate.  But the

15   primary concern for the foundation is that its assets not

16   be scattered to the wind.

17        THE COURT:  All right.  Anything else?

18        MR. WESTBY:  I don't think so, Your Honor.

19        THE COURT:  All right.  Thank you.

20          Let me hear from counsel for Mr. Alexander.

21        MR. KATOFSKY:  Thank you, Your Honor.

22          Good afternoon, Your Honor.

23        THE COURT:  It is now afternoon.  Good afternoon.

24        MR. KATOFSKY:  Jeff Katofsky for Rex Alexander.

25        THE COURT:  And let me just clarify.  I understand

1    from my review of the papers in connection with the

2    temporary restraining order that you do represent all of

3    the defendants; is that right or not?

4        MR. KATOFSKY:  Well, not necessarily, Your Honor.

5    I will be --

6        THE COURT:  Can you please clarify who you

7    represent?

8        MR. KATOFSKY:  Right now I represent Rex

9    Alexander.

10        THE COURT:  Anyone else?

11        MR. KATOFSKY:  When she is served, I will be

12    representing Misty Hammer.  It is not yet clear whether I

13    will be representing Mark Alfano, Bull Canyon.  I may be

14    representing one.  I may be representing both.  I may be

15    representing none.  Unclear at this point, Your Honor.

16        I do represent -- I have represented

17    Mr. Alfano in the past in other matters.  I don't know if

18    that is going to be here.  There are some potential

19    conflict issues that we are working through, and there

20    may be a different lawyer for either Mr. Alfano, his

21    company or both.

22        But I will be representing Misty Hammer.  She

23    is not evading service.  She went to Arizona to spend the

24    holidays with her parents.

25        THE COURT:  Well, I recognize that you refuse to

1    accept service on behalf of defendants generally which,

2    of course, you are not obligated to do.  But would you be

3    willing to facilitate service so as to identify for the

4    plaintiff where your other potential clients are so they

5    can be served and move the lawsuit forward.

6         MR. KATOFSKY:  Let me give you a guilty with

7    explanation, Your Honor.  When the lawsuit in Florida was

8    filed against Viktor Hammer and Morgan Stanley, counsel

9    in Florida asked counsel to my right if they would

10   accept -- and I am not sure which member of the firm --

11   if they would accept service of Mr. Hammer in that case,

12   and they told him no.  So when they asked me if I would

13   service on behalf of my clients, I said I will give you

14   the same courtesy that you gave Mr. Banker in Florida and

15   I did not accept it.

16        THE COURT:  I read the e-mail.  I saw it.

17        MR. KATOFSKY:  As far as will I -- I will contact

18   Mrs. Hammer and ask her if she will give me that

19   authority.  I don't have that authority one way or the

20   other.  If she says yes, then I will accept service.

21             As to Mr. Alfano and Bull Canyon.  Again, they

22   are out of town.  Mr. Alfano is out of town with his

23   family.  I can make that phone call as well.  I just

24   don't know whether I will be representing him or not.

25        THE COURT:  I understand.

```
 1          MR. KATOFSKY:  If I am going to be, then I will
 2   make the same request.
 3          THE COURT:  You raise the specter of conflict.
 4   What of you taking a position on HIF's board?
 5          MR. KATOFSKY:  HIF is not a party to this action,
 6   Your Honor.
 7          THE COURT:  It may be a third party, I guess;
 8   right?  May be a witness.  You may be a witness.
 9          MR. KATOFSKY:  I don't know.  That is a good
10   question, Your Honor.  I don't know whether it is
11   appropriate to make me a witness.  If I am going to be a
12   witness --
13          THE COURT:  Witnesses are witnesses.
14          MR. KATOFSKY:  I understand.  If it turns out that
15   I am a witness in this case, I will have to look at that.
16   I don't have an answer for you.  Maybe there is a point
17   where I can't be counsel in this case.  If that is the
18   case, we will have to deal with that.
19          THE COURT:  Well, obviously, be mindful of it.  As
20   you know, corporate entities or entities in general, in
21   order to proceed and be represented, must have counsel.
22   They can't proceed pro se.
23          MR. KATOFSKY:  Well, I am not representing HIF in
24   California or in any other state, quite frankly, right
25   now.  They have counsel in the Caymans and in Florida.
```

1    It is a Cayman entity, and I am not licensed in either

2    Florida or the Cayman islands.

3            Let me hit a couple of points that, small ones

4    that I don't want to forget before I get into a little

5    bit of argument if I may, Your Honor.

6         THE COURT:  You may.

7         MR. KATOFSKY:  Dave Smith, to my knowledge, is not

8    the sole employee or was not the sole employee of AHF.

9    Michael Hammer was an employee of AHF.  I believe they

10   had a bookkeeper by the name of Becky or Becca that was

11   an employee of AHF.  And then they had various

12   consultants one of which was Mark Alfano and others, rand

13   Barton was another, that were on their payroll.

14        THE COURT:  And where were these employees

15   located?

16        MR. KATOFSKY:  Mr. Alfano lives in California.

17        THE COURT:  Okay.

18        MR. KATOFSKY:  He is -- he was a consultant.  He

19   was a 1099 as opposed to a W2.  Mr. Barton --

20        THE COURT:  So he is not an employee?

21        MR. KATOFSKY:  He was not an employee per se.  He

22   was on the payroll, though.  So the payroll company I

23   believe ran that as well.

24        THE COURT:  But he was paid as an independent

25   contractor?

```
 1            MR. KATOFSKY:  He was.  Mr. Barton was also paid
 2    as an independent.  Mr. Barton resides I believe in Saint
 3    Louis or in Idaho.  He is an Idaho lawyer.  Somewhere in
 4    the middle of the country.  Becky, I don't know.  I know
 5    she works remotely.
 6            THE COURT:  Is she a W2 employee?
 7            MR. KATOFSKY:  I believe she was a W2.  Mr. Hammer
 8    resided in the Caymans for the most part.
 9            THE COURT:  Michael Hammer.
10            MR. KATOFSKY:  Michael Hammer.  He was back and
11    forth.
12            THE COURT:  Was he a W2 employee?
13            MR. KATOFSKY:  Yes.
14            THE COURT:  And so he resided in the Cayman
15    Islands, and then, you know, I have addressed the
16    November, 2020, minutes with opposing counsel.
17    Mr. Hammer, Mr. Michael Hammer, he was also doing
18    business in Florida or doing foundation business in
19    Florida as of late 2020?
20            MR. KATOFSKY:  Mr. Hammer had residences in the
21    Caymans, Florida and two places in California and was a
22    dual citizen of the United States and the Cayman Islands
23    and spent really his entire life sort of flipping back
24    and forth between the US and Caymans.  It wasn't a new
25    thing.  He almost grew up in the Caymans.  And there were
```

1    times he was there for many, many years, and then he

2    would come back to the US and be here for years.  When he

3    was in the Santa Barbara, Carpenteria area, he had a home

4    there up until the mudslides.

5         THE COURT:  And when was that?

6         MR. KATOFSKY:  Pre-Covid.  Timing for me is a

7    little bit off after we all lost three years, but I think

8    the mudslides were in '19, '18?

9         THE COURT:  2018, 2019?

10        MR. KATOFSKY:  I think that's right.  He sold his

11   home after the mudslide.  Yes.  He never moved back into

12   it, and when he was in California, then, he resided as

13   Mr. Westby said in the apartment portion of the

14   Carpenteria building.  So the majority of the items in

15   that building are actually the Hammer estate's, and there

16   is a letter we provided you from the probate lawyer on

17   that issue.  So that is a quirk we are going to have to

18   deal with.

19             For instance, Misty Hammer's clothing is in

20   that building.  So you have effectively precluded her

21   from getting her clothes back at this point.  You

22   certainly wouldn't have known this, but that was one of

23   the quirks that we have now.  So that building which I

24   agree was a warehouse.

25        THE COURT:  Has she been living in California?

```
 1        MR. KATOFSKY:  She came back to California.
 2   Mr. Michael Hammer when he became very ill felt that the
 3   medical attention he would get in Los Angeles would be
 4   better than he would get in the Caymans, and they came
 5   back to California.  And they lived for a period of time
 6   in that Carpenteria building, and then they recently
 7   moved to the Four Seasons Hotel in Beverly Hills because
 8   it is closer to Cedars-Sinai where his doctors were
 9   rather than to transfer back and forth weekly.  And he
10   passed away at the Four Seasons Hotel in Beverly Hills.
11   He was in California I think Mr. Westby is correct most
12   of '22 with his wife.
13        THE COURT:  With Misty Hammer?
14        MR. KATOFSKY:  Prior to that, the entire period of
15   Covid they were in the Caymans, and they moved to the
16   Caymans I think just prior to that.  I don't know the
17   exact dates.  I want to say the end of '19 until the
18   beginning of '22 with him coming back to the States on a
19   couple of occasions for an affair or two, as part of his
20   foundation duties.
21        THE COURT:  And when he did come to the United
22   States on foundation business, where did he go?
23        MR. KATOFSKY:  He would go to Carpenteria.  They
24   also own a home.
25        THE COURT:  So does Florida at all play a part in
```

1   the foundation's operations?

2        MR. KATOFSKY:  That is a great question for the

3   people in Florida who operate there.  I don't.  I mean, I

4   speak to the lawyers in Florida.  There are many.  And

5   the accountants in Florida.  There are some.

6        THE COURT:  We are talking about third party --

7   these are external lawyers and accountants; right?  They

8   work for the foundation?

9        MR. KATOFSKY:  Vendors.  Yes.  Just like I am.  As

10   far as the Armand Hammer Foundation is concerned, if they

11   use me, I am a vendor just like if they use Mr. Banker or

12   Mr. Sterns.

13        THE COURT:  But you are here.  But you are saying

14   that there are lawyers and accountants in Florida that

15   provide services to the foundation?

16        MR. KATOFSKY:  Oh.  Absolutely.  The main firm is

17   Bush Ross who is handling the two litigations that

18   Mr. Westby described that we put in my declaration.

19        THE COURT:  And do you know of any other business

20   that is -- foundation business that has been done since

21   the merger; right?

22        MR. KATOFSKY:  I have very little to do -- have

23   very little knowledge of AHF business.  It just hasn't

24   been something that I have done over the years for

25   Mr. Hammer.  Primarily, I did things directly for

```
 1   Mr. Hammer during his lifetime as a lawyer.  I didn't
 2   really deal with foundation matters.  So I mean, I would
 3   tell you if I knew.  I don't want to misquote or guess,
 4   Your Honor.
 5       THE COURT:  Well, you removed the action, right,
 6   on behalf of your client?
 7       MR. KATOFSKY:  I did.
 8       THE COURT:  And why was that.
 9       MR. KATOFSKY:  Two-fold, Your Honor.  One is my
10   understanding is that AHF moved to Florida and operates
11   out of Florida and primarily out of the Caymans.  If you
12   really asked me where the foundations operate out of,
13   that would be the Cayman Islands.  But for the United
14   States purposes, I have been told and been advised that
15   it is in Florida.  The pleading itself in paragraph 116
16   says that it is both a Florida entity and its principal
17   place of business is in Florida.
18       THE COURT:  When you say the pleading, you are
19   referring to which pleading?
20       MR. KATOFSKY:  The verified complaint brought in
21   this action.
22       THE COURT:  By the plaintiff in this action?
23       MR. KATOFSKY:  The plaintiff in the verified
24   complaint verified that the principal place of business
25   was Florida which we have put in our papers.
```

```
 1          THE COURT:  Yes.

 2          MR. KATOFSKY:  And in analyzing it, I don't

 3   believe if I remember my constitutional law correctly

 4   from law school back long ago that Misty Hammer or Mark

 5   Alfano could not have removed because they live in

 6   California.  But Rex Hammer(sic) doesn't.  He lives in

 7   Texas.  Before that he lived in Oklahoma, and he has the

 8   ability to remove.  So I believe that removal was proper.

 9            Now, there was an argument that we removed two

10   days before the TRO.

11          THE COURT:  The hearing.  The point is the hearing

12   in Santa Barbara Superior Court.

13          MR. KATOFSKY:  The papers had not yet been served.

14   We hadn't seen them yet.

15          THE COURT:  When you say the papers, what do you

16   mean by that?

17          MR. KATOFSKY:  The motion papers for the TRO.  We

18   have not been served with those yet.  I believe the

19   action --

20          THE COURT:  As of the day of the removal, you had

21   not yet been served with the motion for the temporary

22   restraining order?

23          MR. KATOFSKY:  That's correct.

24          THE COURT:  In Santa Barbara County Superior

25   Court?
```

 1      MR. KATOFSKY:  That's correct.  We had been told

 2   there would be a hearing, but we had not been served any

 3   papers yet.  And I don't even think the complaint was

 4   even a week old.  I mean, we had a lot more time to

 5   remove, but if we are going to remove, why remove after a

 6   TRO when it is coming.  Why have a Court that we don't

 7   believe will end up with jurisdiction rule on a motion

 8   like that, bring it here and let it be heard hear.  So we

 9   knew certainly it would be refiled here even though we

10   hadn't seen it yet.  But we didn't wait the full time for

11   removal.  We removed immediately.

12      THE COURT:  And you removed because you believe

13   that the nerve center for AHF is somewhere other than

14   California?

15      MR. KATOFSKY:  Well, if I had to swear, I would

16   tell you it is the Cayman Islands.  So, yes, I do.  Could

17   I tell you whether more work gets done in Florida --

18      THE COURT:  Is that because two of the board

19   members live there?

20      MR. KATOFSKY:  My understanding is that the

21   majority -- if you are adding up assets in quantity

22   rather than value, then the majority of the assets of

23   these two entities are in the Caymans.

24      THE COURT:  Well, that is based on this theory

25   that AHF lawfully transferred its assets to HIF?

```
 1          MR. KATOFSKY:  No, it is not.

 2          THE COURT:  Other assets?

 3          MR. KATOFSKY:  HIF has been around for a long

 4   time.  HIF has substantial assets.

 5          THE COURT:  Right.  But that is not AHF?

 6          MR. KATOFSKY:  That is why I said of the two

 7   entities.  There is a -- it is difficult sometimes to

 8   determine which entity is doing what.  For instance, the

 9   computer systems that Mr. Westby was talking about are

10   HIF's.  They always have been.  All of the -- even

11   Mr. Smith's e-mail is a Hammer International Foundation

12   e-mail because there are no Armand Hammer Foundation

13   e-mails.  All the e-mails are Hammer International

14   Foundation.

15          THE COURT:  When you say the e-mails, you mean the

16   addresses or the actual --

17          MR. KATOFSKY:  If you were going to e-mail

18   Mr. Smith where he worked, I think it was DRSmith at

19   Hammer International Foundation.  The e-mails for the

20   entities were all Hammer International Foundation.  All

21   the computer systems were Hammer International Foundation

22   well before this.

23          THE COURT:  And when you say this, what do you

24   mean?

25          MR. KATOFSKY:  The controversy we are here talking
```

```
 1    about now.
 2           THE COURT:  Which you would date to what, the time
 3    that Mr. Hammer became ill?
 4           MR. KATOFSKY:  I have been -- I have been working
 5    as a lawyer for Michael Hammer for seven or eight years,
 6    and I will tell you that the e-mail addresses for the
 7    foundation and the only e-mail addresses for the Hammer
 8    International Foundation predate my knowledge of that
 9    eight years.  It was already Hammer International
10    Foundation when I started working for Mr. Hammer.  This
11    is not new which gets me -- if I can shift for a moment,
12    Your Honor?
13           THE COURT:  Go ahead.
14           MR. KATOFSKY:  We have spent now well over an hour
15    primarily talking about a merger, and if you look at the
16    papers brought by the plaintiff in both the TRO and the
17    preliminary injunction, the word merger doesn't exist.
18               And let me tell you why that is really
19    important.  They are making it sound, the plaintiff is,
20    as if Rex Alexander and the other defendants are running
21    around stealing things for no reason other than their own
22    good, and they weren't.  They weren't stealing things at
23    all.  They were doing business that they were authorized
24    to do.  Now --
25               THE COURT:  By?
```

```
 1          MR. KATOFSKY:  By AHF.

 2          THE COURT:  By board resolution?

 3          MR. KATOFSKY:  By minutes, by board resolution.

 4   If you look at, for instance, let's take a couple of the

 5   exhibits that Mr. Westby, look at 32 and 33, both at the

 6   tail end of them have, under general approvals, have

 7   motions made ironically by Viktor Hammer in both

 8   situations that give the officers the authority to go do

 9   what they need to do for board business.

10          Now, Mr. Alfano wasn't yet an officer.

11   Mr. Alexander was.

12          THE COURT:  That language seems to be fairly

13   standard throughout these documents; right?

14          MR. KATOFSKY:  It absolutely is.

15          THE COURT:  So what does it really mean?

16          MR. KATOFSKY:  Well, corporations typically almost

17   always have to act through their officers and employees.

18          THE COURT:  Of course.  Of course.

19          MR. KATOFSKY:  You don't have a board of director

20   meeting to run the payroll every two weeks so when you

21   determine that you are going to merge the two entities

22   together -- and Mr. Westby said I think three times this

23   is about AHF's existence, they are going to merge us out

24   of business.  They all agreed that this was going to

25   happen, they meaning Viktor Hammer, Pete Sansone, Jim
```

```
 1   Frazier, the three people who now run the board.  Michael

 2   Hammer, Rex Alexander and later Misty Alexander(sic).

 3        THE COURT:  Misty Hammer.

 4        MR. KATOFSKY:  Misty Hammer.  Sorry.  These were

 5   all unanimous votes on every occasion.  It was always

 6   determined that AHF was going to go out of existence into

 7   HIF.

 8        THE COURT:  And where is that?

 9        Counsel showed me the 2017 minutes; right?  It

10   doesn't say it, does it?

11        MR. KATOFSKY:  That AHF was going to get merged

12   into HIF?  Oh.  I think it does.

13        THE COURT:  How so?  How do those minutes reflect

14   that that is the approved course of conduct for AHF?

15   Authorized conducted by the board.

16        MR. KATOFSKY:  You have an agreement of merger

17   that was signed by four of the five members.  Viktor

18   Hammer actually, either he didn't sign it or we can't

19   find the signature.  We do have the other four.  So you

20   were right on that, Your Honor, that we didn't have every

21   signature.  We were unable to locate his.  Although,

22   there is no indication in any of the documents we

23   provided you or that we have that he has ever objected to

24   the merger of the entities.

25        And I am jumping around a little bit, but it
```

```
 1    is not as if Mr. Hammer, Mr. Sansone and Mr. Frazier's
 2    counsel here to my right were unaware of the merger
 3    agreement.
 4              In the exhibit --
 5         THE COURT:  I think their argument is not that
 6    they weren't aware of it but it just wasn't executed;
 7    right?  The document was signed, as you said, by all
 8    minus one board member at the time.
 9         MR. KATOFSKY:  Right.
10         THE COURT:  But then steps weren't taken until it
11    seems like a mad scramble before Mr. Michael Hammer
12    passes to try to give effect to that agreement from 2017.
13         MR. KATOFSKY:  I think that there is some truth to
14    that, but, on the other hand, we know in '20, we know
15    that the attorney general for the State of California had
16    an issue with it, and that took some time.
17         THE COURT:  Did that get resolved?
18         MR. KATOFSKY:  It did get resolved.  I was not
19    part of that.  That was sort of beyond my scope as
20    counsel so I can't speak to it with personal knowledge,
21    but we know it got resolved because in '20 we have the
22    merger from California to Florida.
23         THE COURT:  Understood.  Why does California still
24    exist -- right -- if it has been merged into HIF?
25         MR. KATOFSKY:  It doesn't.
```

```
 1          THE COURT:  So why is there now a merger agreement
 2   between AHF California merging into and being subsumed by
 3   AHF Florida?  Why is that even happening.
 4          MR. KATOFSKY:  Are you asking me short of
 5   malpractice by some lawyers and not paying attention
 6   because that may be the answer because everybody on that
 7   board of directors -- because the board of directors
 8   doesn't change.  California, the five people on the board
 9   of directors in California become the five people on the
10   board of directors in Florida in the exact same
11   positions.  That part doesn't change.  The heads don't
12   change.  The people don't change.  The concept doesn't
13   change as they continue to move along.
14              Covid absolutely gets in the way because in
15   '20 we have Covid.  That is certainly part of what is
16   going on.  People are all over the place.  They are in
17   different countries, and the world is a mess.  But they
18   are all doing -- it hasn't changed.  The idea of putting
19   these two entities which do effectively exactly the same
20   thing to move them across into the Caymans never changed.
21              And no one ever said anything other than that.
22   Now, if you want to argue they didn't dot their Is and
23   cross their Ts correctly, you are not going to get any
24   disagreement from me, Your Honor.
25          THE COURT:  Why did it go to Florida in the first
```

1    place?

2         MR. KATOFSKY:  I don't have the answer.

3    Mr. Sterns and Mr. Barton certainly would because those

4    are the guys handling it.  It is not what I did.  And I

5    don't -- I am not an M and A guy.  I am not a merger

6    lawyer.  I am a litigator.  Mr. Sterns is a corporate

7    merger guy.

8         And I don't know.  I wish I did.  I hate to

9    say things like that that I don't know, but I would

10   rather tell you I don't know than make something up.

11   They had a reason to do that.  I believe they felt they

12   had to have some US presence for whatever reason before

13   they completed it into the Caymans.

14        My understanding -- it is interesting to me

15   that the lawyer handling the merger is in Florida and a

16   Florida lawyer, and that may be part of it because maybe

17   they were hired because they felt that for tax

18   purposes -- and I want to get to the tax thing in a

19   second -- they needed to be in Florida first.  501(c)(3)

20   corporations do get taxed on certain things.  Churches

21   don't.  But this entity did.

22        It did pay taxes.  Not like you and I would

23   pay taxes, Your Honor.  It does pay taxes.  It pays

24   quarterly taxes.  It pays all sorts of other taxes and

25   the accountants did advise that there would be in excess

1    of $4 million in tax if the majority -- of all of the

2    paintings, eight of them have the biggest value.  Those

3    are the eight now hanging in the Santa Barbara museum.

4            If they weren't made for public consumption

5    for lack of better terms prior to the end of the year,

6    there would be a tax in excess of $4 million.  That was

7    what the accountant said.  That is what the tax lawyer

8    said.  So they were put in that museum for now, hanging.

9            Now, why would that be an AHF tax problem and

10   not an HIF tax problem?  Because for the majority of the

11   year, they were in AHF's name not HIF's name.  It would

12   have been an AHF tax problem.

13           Do I have that personal knowledge?  Only that

14   that is the hearsay I got from the accountants and the

15   lawyers who handle those matters.  It was the information

16   that was given to Mr. Alfano who then called the museum

17   and had them pick up those eight paintings under the

18   appropriate documentation.  This is not the first time

19   that that had been done.

20           In fact, two of the paintings of the eight had

21   already been in the museum for a period of time.  This

22   was adding the other six.  This was something that was

23   normally done in part to avoid tax liability with these

24   paintings.  I am aware of the history of the paintings

25   because I did do the work to have them released from the

1    Armand Hammer museum to the foundation about seven or

2    eight years ago.

3         THE COURT:  And when did the eight paintings go to

4    the Santa Barbara County museum?

5         MR. KATOFSKY:  Two of them went I want to say

6    either earlier '22 or it may even be late of '21, the

7    other six in I believe it was October at the time when

8    the accountants came up with their you need to do this.

9         THE COURT:  And was any of that raised with the

10   AHF board, that being the decision to move paintings for

11   that reason, for that specific reason?

12        MR. KATOFSKY:  No.  No.  This was something that

13   was normal practice for this entity.  And let me take

14   exception with the concept of officers having to run to a

15   board that didn't even meet once a year in its history to

16   ask for permission to do daily activities.

17        THE COURT:  To move its six most expensive

18   paintings.

19        MR. KATOFSKY:  Isn't that the treasurer's job,

20   Your Honor?  If the treasurer doesn't do that, he is

21   breaching his fiduciary duty.  If Mark Alfano is

22   treasurer of this entity, let those paintings sit there

23   until today and didn't move them, then AHF would have

24   over $4 million in tax liability that they can't reverse.

25        THE COURT:  But a special meeting could have been

 1  called.  We have seen special meetings being called.

 2       MR. KATOFSKY:  You had a deadlocked board.  So

 3  even if --

 4       THE COURT:  I guess why do you presume there would

 5  not be consensus on moving six to eight paintings from

 6  the foundation to the museum to avoid a $4 plus million

 7  tax liability?

 8       MR. KATOFSKY:  For several months, you could not

 9  get consensus to have a meeting of this board at all, and

10  I don't know how much of that -- we documented some of

11  it.  There is more.  But when Viktor Hammer found out

12  that his father, Michael, had named Mark Alfano as his

13  power of attorney, he then recruited Pete Sansone and Jim

14  Frazier and the board deadlocked.  And the board remained

15  deadlocked for quite some time.

16       So you have a choice if you care.  If you are

17  Rex Alexander or you are Mark Alfano and you are officers

18  of this foundation, and Rex Alexander had been one for

19  decades and Mark Alfano had been Michael Hammer's

20  confidant for a very, very long time, you care about him

21  and you care about the family name and you care about

22  this foundation, then you are going to do what you should

23  do as a fiduciary and as an officer of this foundation

24  and do your job.

25       And while I will never agree, Your Honor, with

1    the argument that you have to go back to a board that

2    doesn't meet very often anyway and ask them every time

3    you need to do something or do your job as a fiduciary, I

4    am always going to say the latter is appropriate and that

5    is what they did.

6          Now, maybe a jury will disagree with me on

7    that, Your Honor, but that is what Mark Alfano needed do

8    with those paintings.  He didn't need to go get

9    permission.  It is his job as the treasurer, and it is

10   what the bylaws say this company is about.

11        THE COURT:  I mean would it be fair to say that

12   those individuals who had roles as officers and

13   Mr. Alexander who was also a board member would take

14   direction from Mr. Michael Hammer.

15        MR. KATOFSKY:  Absolutely.  Yes.  Absolutely.  Who

16   had really unfettered power if you read through the

17   bylaws and the minutes.  Michael Hammer could pretty much

18   do anything he wanted.  They gave him unfettered power in

19   the organization.

20        THE COURT:  When you say they gave him?

21        MR. KATOFSKY:  The board.  The board of directors

22   did.  And the bylaws.  If you read through all of it,

23   Michael Hammer always had the power to do pretty much

24   anything he wanted.

25        THE COURT:  I only have exhibits that you provided

1    me.

2    MR. KATOFSKY:  There is so much more.  There was

3    only so much we could give you over a holiday weekend,

4    Your Honor.  I can't believe you read it all in that much

5    time to be honest, but I know you did because I can hear

6    it.  But it is a lot.

7    Let me get to what I think is really the most

8    important part of today's hearing, this preliminary

9    injunction, because really what the plaintiff wants, the

10   plaintiff wants to apparently go back in time and say we

11   didn't really want this merger that we all voted for,

12   that we all continued on, that our lawyer from Nelson

13   Mullins on October 7th, Mr. Love, asked about.

14   THE COURT:  The status of the merger.

15   MR. KATOFSKY:  Yeah.  Wanted to know about it and

16   attached the merger agreement from 2017 to it.  Now, the

17   argument is it didn't apply, but, on October 7th, they

18   were wondering why it hadn't been finished yet.  Not a

19   claim, oh, this expired five years ago, but, hey, what is

20   going on with this, why isn't it done yet.  And then

21   Mr. Banker's reply in Florida is we are working on it

22   now.  We are doing things for it.

23   So this is not a secret that this was going

24   forward, and, again, even today, we haven't heard an

25   objection yet about the merger going forward.  So if they

```
 1   don't want to do it or this board now, these three

 2   gentleman, if they want to, could call a proper meeting

 3   if they can figure out how to do that and all vote that

 4   we no longer want to have a merger, we are going to

 5   cancel the 2017 merger agreement, we are going to come

 6   back to California.  They have the ability and the right

 7   to do that if they so choose.

 8        Nobody can stop them.  They haven't done that

 9   yet, and that doesn't change the past.  It doesn't make

10   what happened and what Mr. Alexander did as an officer or

11   Mr. Alfano did as an officer -- and I don't know why

12   Mr. Hammer is even a party to this case.  It doesn't

13   change the fact that what they did was authorized at the

14   time.

15        Now, they can complain that the Is weren't

16   dotted, the Ts weren't crossed.  They can take that up

17   with somebody else at another time.  These people did

18   things that they were authorized and allowed to do when

19   they did them.

20        THE COURT:  By Mr. Michael Hammer.

21        MR. KATOFSKY:  My Michael Hammer and I believe by

22   AHF itself.  Now, they don't control these assets.

23   Enjoining them, they want a claw back effectively.  They

24   haven't said that, but that is really what they want.

25   They want you to somehow order a claw back.
```

KATIE THIBODEAUX, CSR, RPR, CRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          THE COURT:  Well, that is assuming there has been
 2   a valid transfer to begin with.
 3          MR. KATOFSKY:  True.  But that is not before you
 4   now.  I don't think it is before this Court or the state.
 5          THE COURT:  When you say now, it is part of the
 6   action, isn't it?  Are they not seeking declaratory
 7   relief in connection with the foundation?
 8          MR. KATOFSKY:  But Rex Alexander, Mark Alfano and
 9   Misty Hammer can't give them back anything.  Is is not in
10   their possession.  They didn't take anything.
11          THE COURT:  So where is the art physically?  Eight
12   pieces are in the Santa Barbara County museum.  Where is
13   the rest of it?
14          MR. KATOFSKY:  The rest of it is in the building.
15          THE COURT:  It is in the Carpenteria warehouse?
16          MR. KATOFSKY:  Unless some were in the Caymans
17   because they were already there.  I would have to double
18   check that to see where they are.  The majority of them I
19   believe are in that building, and there may be some in
20   the Caymans.
21          THE COURT:  If there are some in the Caymans, when
22   did they go to the Caymans?
23          MR. KATOFSKY:  They would have been there for a
24   long time.
25          THE COURT:  What is a long time?
```

```
 1          MR. KATOFSKY:  Years.

 2          THE COURT:  And they would be stored where in the

 3   Caymans?

 4          MR. KATOFSKY:  I don't know.  There is multiple

 5   properties owned by Hammer International Foundation in

 6   the Caymans.  Let me put it this way, Your Honor, to my

 7   knowledge, and I have inquired, nothing has left that

 8   building.

 9          THE COURT:  The Carpenteria.

10          MR. KATOFSKY:  The Carpenteria building other than

11   the paintings that are in the Santa Barbara museum in

12   2022 of any value.

13          THE COURT:  Okay.  I want to make sure I

14   understand the statement you just made.  You are

15   representing to me that of the art that was stored at the

16   Carpenteria property in 2022, the only pieces that have

17   been moved out of that property are currently residing at

18   the Santa Barbara County museum?

19          MR. KATOFSKY:  That's correct.  That I do know.

20   What I don't know is did some smaller thing leave the

21   building.  I don't believe that it did.

22          THE COURT:  What is a smaller thing?

23          MR. KATOFSKY:  It is a 10,000-foot building, and I

24   have been told that probably 90 percent of it is part of

25   the Hammer estate and not either foundation, and so there
```

1   certainly were things that would have left the building.

2   You know, they were living there earlier this year.  So

3   they certainly would have taken things out, clothing,

4   maybe a car.

5          THE COURT:  Right.  But that is not, as you said,

6   it is not AHF property.

7          MR. KATOFSKY:  That's correct.

8          THE COURT:  I am asking about AHF property which I

9   largely understand to be the art.  I don't know what else

10  there may be.

11         MR. KATOFSKY:  There is --

12         THE COURT:  Other than the real property itself.

13         MR. KATOFSKY:  The real property and the art are

14  the primary assets.  There is a list of other assets.

15  The lists are in here.  They are in the pile of stuff we

16  have provided you.

17         THE COURT:  I saw it, yes.

18         MR. KATOFSKY:  My understanding and my belief is

19  that nothing that would be owned by AHF in the past other

20  than those six other pieces of artwork, unless all eight

21  went this year, I don't know that answer on the other

22  two, would have left the Carpenteria building in '22.

23             Is that a better way to put it, Your Honor?

24         THE COURT:  I think you are saying the same thing.

25  Okay.  You provided -- there is an art transfer

1    agreement.  The art transfer agreement contains

2    essentially an inventory of art -- right -- that belongs

3    to the foundation AHF.

4         MR. KATOFSKY:  It did.

5         THE COURT:  Yes.  Are all of those pieces either

6    at the Santa Barbara museum or at the Carpenteria

7    property, or are some of those pieces in the Cayman

8    Islands?

9         MR. KATOFSKY:  I am not a hundred percent sure,

10   but I do believe that some of them may be in the Caymans.

11   They could all be in Carpenteria, but some may be in the

12   Caymans.  They are not in a fourth place if that is your

13   question.  They are in one of the three.  And the reason

14   why there is a separation between those pages of artwork

15   and the other eight is value.  You know, the value of the

16   non-eight paintings is a six digit number, maybe it

17   reaches to seven, as opposed to the other artwork which

18   is of eight digit value, the ones that are hanging in the

19   museum.

20        THE COURT:  So what value would you put on the

21   art?

22        MR. KATOFSKY:  If you were to put them on the

23   market now and sell the art that is in the museum right

24   now, probably anywhere from 60 to 80 million.  There were

25   more paintings in the past that were part of this.

```
 1        THE COURT:  And the rest is a million or less?
 2        MR. KATOFSKY:  The rest combined is somewhere
 3   around a million dollars.  Yes.
 4             There were more paintings from the Armand
 5   Hammer collection.  If you want me to take a step back,
 6   the Armand Hammer collection at UCLA which many of us
 7   have seen over the years obviously came from Michael
 8   Hammer's grandfather.  When Armand Hammer passed, Michael
 9   was the heir aapparent.  It skipped a generation.  And
10   there was always a question about I believe it was 13 of
11   the paintings as to whether they should be in the museum
12   or whether they should be with the foundation.
13             My job, my first job for Michael Hammer was to
14   help release those paintings to the foundation which I
15   did.  Some of those were then sold to then fund the works
16   of the Armand Hammer Foundation which is really its sole
17   purpose is giving money away to charity.  That is all it
18   does.  That is all Michael Hammer did his whole lilfe was
19   give money away to people who needed it,  and that is I
20   believe -- and I am not a tax attorney, I don't even want
21   to pretend to be one -- I believe that was one of the
22   reasons why this entity in particular does pay some
23   taxes.  When it sold that art, it paid taxes.  And the
24   assets from that collection -- and this is, again, why
25   the California attorney general, I believe is more
```

 1  involved is a taxable thing, and so this foundation does

 2  pay tax.

 3          It is late on its taxes right now because

 4  before the changeover in -- before Michael died and Mark

 5  Alfano as treasurer tried to get money released from the

 6  AHF account to pay AHF's taxes and Morgan Stanley refused

 7  to do so because Viktor Hammer would not allow it.  How

 8  do I know that?  It is because Morgan Stanley told me

 9  that.

10      THE COURT:  Your papers speak to a nearly

11  $20 million line of credit so what is the Morgan Stanley

12  account?  Is there money held in cash that is an outright

13  asset of AHF, or is it a line of credit or both?

14      MR. KATOFSKY:  It is neither.  Well, it is a line

15  of credit, and it is securities.  So the securities --

16  there is no cash.

17      THE COURT:  Okay.

18      MR. KATOFSKY:  The securities depending what day

19  you look at it and obviously it has taken a hit this year

20  like the rest of us is somewhere in the neighborhood of

21  25 to 26 million in security value, and the line of

22  credit is 20.  If I am off by a million, I have the gap

23  right.  It is about a 5- or $6 million gap.  Morgan

24  Stanley is charging six figures a month on that line of

25  credit which the foundation pays.

```
 1              The line of credit as you saw from the
 2    exhibits we gave you, recently, last few months, was
 3    $832,000 overdrawn which means the only way to pay that
 4    would be to sell securities to make up that difference.
 5              That was around the time where Viktor Hammer
 6    complained that Mike McGrew wasn't getting the check that
 7    he believed At Ease 911, Mike McGrew charity was supposed
 8    to receive.  It is also the time that Rex Alexander made
 9    decisions to reduce overhead and fire all employees.
10    And, by the way, Michael Hammer's salary was ended at
11    that point as well, and he was alive.  His salary
12    stopped.  Mr. Smith was terminated, and this is beside
13    the point that David Smith got caught with his hand in
14    the cookie jar which we provided you, over a couple
15    hundred thousand dollars taking money from the foundation
16    which we have given you and I am giving you the back up
17    for.
18              And all of the members of the board of
19    directors were provided that information.  It was part of
20    Mr. Alfano's duty as the treasurer was to review that.
21    Everybody was fired including Mr. Hammer, Michael Hammer,
22    and nobody was paid because there was no money.  You
23    can't start the day at minus 832,000 and say let's write
24    some checks.
25              THE COURT:  You would have had to liquidate
```

1    securities is what you are saying; right?  Which I

2    presume the board would have had to approve?

3         MR. KATOFSKY:  That's right.  And Mr. Alexander

4    tried to call a board meeting, and the deadlocked board

5    wouldn't allow it.  This is part of the problem with the

6    stagnation of the board.

7         THE COURT:  Well, this is following I guess

8    certain documents not being provided -- right -- to the

9    three board members who wanted documents in advance of

10   the meeting?  That is what we are talking about --

11   right -- that series of events?

12        MR. KATOFSKY:  Yes.  That's right.  And I think if

13   you had Mr. Sterns and Mr. Banker here right now and put

14   them in the hot seat, they would both tell you we gave

15   them everything they asked for.  They kept asking for

16   things.  They asked for things they weren't allowed to

17   ask for, and whatever they asked for and they were

18   entitled to we gave them and it was never enough.  I

19   think, personally, I think it was a smoke screen.  I

20   think that were waiting to take over or Mr. Viktor Hammer

21   was waiting to take over and was waiting for his father

22   to die.

23             But this was a stagnant company that was in

24   the middle of a merger and you had two gentlemen out

25   there on an island trying to keep things afloat,

1   Mr. Alexander and Mr. Alfano, and, again, you notice that

2   I don't keep talking about Misty Hammer.  She is not

3   doing anything, any of this.  And they are doing their

4   fiduciary duty to make sure that the whole town doesn't

5   go in the toilet.

6            But when you talk about a preliminary

7   injunction, neither Misty Hammer, Mark Alfano or Rex

8   Alexander have done a thing to, from or about the Armand

9   Hammer Foundation since Michael Hammer died on

10  November 20th.  Not a thing.

11           The injunction, to me, the concept of the

12  injunction, these parties here, these plaintiffs -- and I

13  am going to say I understand it is Viktor Hammer is the

14  only one who authorized it, but it is really the three

15  gentlemen -- their complaints really don't begin until

16  November 21st or the 25th when they tried to hold their

17  first meeting and the 28th when maybe they held their

18  second meeting, and it doesn't matter whether they are

19  valid meetings or not, our position is they didn't even

20  do it right.  In reality, they could call a meeting

21  tomorrow.

22           THE COURT:  They have the majority.

23           MR. KATOFSKY:  They have the majority.  Right.

24  They may have had meetings, I don't know, since then.

25  But they have the majority so we are not arguing that.

1    Could they have done most of what they tried to do on the

2    25th?  Yes.  Could they have done all of it?  No.

3           But, again, that is probably a fight for

4    another day.  My client and the other defendants here

5    haven't done a thing since then.  So what are we

6    enjoining them from?  What have they done since the

7    majority took over that is harmful, irreparable or

8    otherwise?  What are they threatening to do?  The merger

9    is stalled at this point.  You can't do it because the

10   parties aren't cooperating.  There is a lawsuit in

11   Florida about that.

12       THE COURT:  Well, there are representations being

13   made to the Court and courts in Florida or court in

14   Florida regarding actions that HIF has taken or is

15   taking; right?  Is that not right?

16       MR. KATOFSKY:  Well, HIF has sued in Florida to

17   force the merger to be completed is probably the best way

18   to put it, and I guess eventually the plaintiff here is

19   going to ask you to stop it.  It sounds like we have

20   reverse cases going on.  And Mr. Westby is correct that

21   the lawsuit which predated this lawsuit in Florida had

22   not yet been served.  It obviously was being amended.  I

23   am not handling that lawsuit.  Florida counsel is.  My

24   understanding is it has been served at this point, but

25   there is no responsive pleading due or anything of the

```
1    sort.
2         THE COURT:  So the Florida complaint that I think
3    was submitted to me; right?  I think it is an exhibit.
4    Maybe it was in connection with the TRO.  I can't
5    remember.  But that complaint is filed before the
6    California complaint but not served until after.
7         MR. KATOFSKY:  That's correct because it was
8    amended prior to service.
9         MR. KATOFSKY:  Right.  So it was filed during the
10   time period that the board had six members one of which
11   was Michael Hammer while he was alive.
12        THE COURT:  How -- not long before his passing.
13        MR. KATOFSKY:  No.  About a week-and-a-half, two
14   weeks.
15        THE COURT:  So I imagine he was not well.
16        MR. KATOFSKY:  He was not, but I will tell you
17   that the -- I want to put in this in a way that I am not
18   breaching a client confidence, Your Honor, because I am
19   certainly in that know.  It was in the works for several
20   months prior.  It just didn't get filed until the
21   beginning of November, and, again, Michael died on the
22   20th.  So I don't remember the exact date.  I think it
23   was maybe the 11th of November.
24        THE COURT:  When the complaint was filed.
25        MR. KATOFSKY:  Complaint was filed, and then it
```

1    was amended in December last month.

2            THE COURT:  And the complaint you are referring to

3    is the HIF v. AHF complaint?

4            MR. KATOFSKY:  Yes.  AHF there really is a nominal

5    defendant.  It is really against the three other members,

6    Mr. Sansone, Mr. Frazier and Viktor Hammer.  And the

7    essence of that case is we are trying to merge the

8    entities as everyone had agreed, and you are stopping it.

9    And we don't need to go into the details.  But that is

10   what is going on there.

11           What this sounds like it is becoming here in

12   front of you, Your Honor, is the reverse which is we want

13   you to reverse everything that was being done for this

14   merger back there 3500 to 7,000 miles away.  And it is

15   almost like a race to the end.

16           I don't think that this case here was filed

17   originally for that purpose because the word merger

18   didn't exist in their complaint or in the TRO or in the

19   preliminary injunction.  But now -- and, again, they

20   can't argue they didn't know about it.  They were arguing

21   that it wasn't completed back in October and giving us

22   copies of it.

23           So that is the fallacy of the argument by the

24   plaintiff here is what do you mean there is a merger,

25   what do you mean you are moving things around, what do

```
1   you mean you are transferring things?  We told you.  You

2   asked about it, and we told you it was being done.  Did

3   we give you the specifics, did we call you up and call a

4   meeting and go, oh, today, we did this?  No.  Do we have

5   to?  No.

6        THE COURT:  Well, let me just ask you this.  What

7   is the harm in, quote, maintaining the status quo right

8   during the life of the litigation?  What is the harm

9   because right now I think the plaintiff is obviously

10  concerned they have essentially lost control -- right --

11  of what it seems everyone will agree are extremely

12  valuable assets.

13       MR. KATOFSKY:  Yes.

14       THE COURT:  So what is the harm in granting

15  relief, preventing the transfer of any further transfer

16  of assets, maintaining the status quo during the life of

17  the lawsuit.

18       MR. KATOFSKY:  I guess the answer --

19       THE COURT:  And, obviously, you could also if you

20  wanted to consolidate things, you could bring parties

21  into this action.  You could file counterclaims, have it

22  all heard.

23       MR. KATOFSKY:  You could.  Although, I think it

24  would end up in Florida because that is where it belongs.

25  I don't know how you bring Hammer International
```

1    Foundation in California, but that is, again, probably

2    discussion for a another time.

3            Being the pragmatist that I am, Your Honor,

4    because I think it was a pragmatic question, is there

5    harm in the status quo?  No.  I don't think there is harm

6    in the status quo.  What is the status quo, and how do

7    you do it is I think a more complicated question.  Is it

8    just to put a preliminary injunction on Mr. Alexander,

9    Mr. Alfano and Mrs. Hammer when they haven't done

10   anything during the complaint time period that they

11   weren't supposed to be doing and there is nothing they

12   can do about it.

13           In other words, it is not like they are

14   holding the artwork in their trunk.  This artwork and all

15   of these other assets are in another foundation in the

16   Cayman Islands.  That is not in front of you.

17           Enjoining Mr. Alexander, Mrs. Hammer and

18   Mr. Alfano doesn't get anyone anything including the

19   status quo.  They can't do it.

20      THE COURT:  Well, they act on behalf of that

21   foundation, don't they?  So it would prevent them from

22   doing anything else.

23      MR. KATOFSKY:  But they are not acting.  You have

24   no evidence before you at all, and I mean zero evidence,

25   that since November 20th of 2022, the date of Michael

1    Hammer's death, that any of the defendants have done a

2    thing on behalf of AHF.

3         THE COURT:  Well, maybe so.  You are using that as

4    the line, right, the brightline, but I think the

5    plaintiff would say, well, before that, they did things,

6    right, that we weren't told about, right, that has been

7    addressed during the hearing.

8         MR. KATOFSKY:  Your Honor, there is a simple

9    answer to that.  Prior to Michael's death, these three

10   plaintiffs didn't have standing to bring this lawsuit.

11        THE COURT:  Well, they would have been 50 percent

12   of the board I guess.

13        MR. KATOFSKY:  Right.  They wouldn't have had

14   standing to bring this lawsuit.  As a non-majority member

15   of the foundation, they wouldn't have a right to bring a

16   lawsuit on behalf of the foundation.

17           So their right to even bring this lawsuit

18   doesn't even begin at best until the 21st of November.

19   So how can they argue about status quo from before that

20   or things that they think they were harmed by prior to a

21   date where they had no standing.  That is why I am using

22   that date.  I think that date is vital.  If they want to

23   argue that things were done at a time where they did not

24   have control or power over the foundation, that is a

25   different lawsuit for a different place.  And it is

1    certainly not for a preliminary injunction against three

2    individuals who can't give them what they want.

3           What they want is a claw back of everything

4    back into AHF.  You can't do that, Your Honor.  With all

5    due respect, you can't.  Not with the parties you have in

6    front of you and the cases before you.  You don't have

7    the power to do it, and I am not sure you can do it with

8    these parties anyway.  And they can't do it.  You could

9    order them to do it.  They can't do it.  Just like you

10   have ordered, again, not your fault because you didn't

11   have this in front of you when you granted the TRO and

12   locked out the Hammers or Mrs. Hammer from getting her

13   own personal belongings or the estate's belongings

14   because you didn't know.

15          Now you do, and I think that is a problem.  I

16   don't think you can order them to have full control over

17   the building in Carpenteria which right now was deeded

18   over to Hammer International Foundation.  Again, they can

19   sue and argue all they want, that was improper.  Maybe it

20   was, and maybe it wasn't.  I certainly don't think it was

21   a problem.  I am the one who sent you to the title

22   company in October.  But it was done.  So title is in

23   another entity, and what is in there is somebody else's.

24   And they have been put on notice of that.

25          THE COURT:  Some of what is.

1       MR. KATOFSKY:  Most of it, quite frankly.  Most of

2   it.  Not all of it.  Most of it.

3       THE COURT:  Well, I imagine they would have no

4   objection to Ms. Hammer going to retrieve her clothes.

5       MR. KATOFSKY:  Well, what about the vehicles that

6   are the estate's and the artwork.  You have to understand

7   that 10,000 feet of just -- it is piles of crap, to be

8   blunt, Your Honor.  There is just stuff everywhere in

9   that building.

10          I mean, when they talk about an inventory, it

11  would take be someone a year to inventory that building.

12  It is just loaded with stuff.  It is things Michael

13  collected forever.  Michael was a collector, and it is a

14  16-foot high building with stuff everywhere.

15      THE COURT:  But as you said most of it does not

16  belong to the foundation; right?

17      MR. KATOFSKY:  Most of it is the estate.  That's

18  correct.  They have an inventory of what was AHS.  I have

19  given it to them.  It is in here.  And I told Mr. Malone

20  when I spoke to him on Tuesday or Wednesday, Monday when

21  we spoke on the phone.  That I would get him an inventory

22  after we finished.  We were rushing to finish this

23  document.  And we decided just put it in the papers.

24  They have got their inventory.

25          THE COURT:  All right.  What else would you like

1    me to hear?

2          MR. KATOFSKY:  I believe, Your Honor, that -- I

3    don't disagree with you.  I have no problem with the

4    status quo.  I don't know how do you that.  The

5    preliminary injunction doesn't give you status quo.  If

6    you want to order the parties -- if you wanted to order

7    my three or the three defendants -- I am not going to say

8    my three clients because that is not yet true, but the

9    three defendants -- to not take action on behalf of AHF,

10   that is fine.  I would stipulate to that.

11          But beyond that, all of these other things

12   that they want, they can't have them.  My clients can't

13   give it to them.  It is not in their possession.  It is

14   not in their control.  They don't control the HIF board

15   either.  There is more people involved.  And that is

16   where this thing is a problem, and the fact that they

17   have spent all this time and money and effort, one, not

18   even telling you there was a merger which I can't get

19   past personally, but trying to have you go back at a time

20   where they did not have control to try to say all of

21   these things that they did, then, were unauthorized or

22   not T crossed and to use that to try to get a preliminary

23   injunction or a receiver or the kind of extraordinary

24   relief they are asking here is absurd.

25          Don't lose sight of the fact that the three

1  gentleman who effectively have brought this suit have

2  only had control over this foundation for five weeks,

3  and, before that, they had no control.  The control was

4  primarily Michael Hammer's because they all gave it to

5  him.

6          So unless you have any other questions, Your

7  Honor.

8          THE COURT:  I do not.  Thank you very much.

9          MR. KATOFSKY:  Thank you, Your Honor.

10          THE COURT:  Anything else from plaintiff?

11          MR. WESTBY:  Just a few things in rebuttal.

12          I want to start with this issue of control and

13  just looking at Section 6.2 of the bylaws.

14          THE COURT:  The AHF bylaws?

15          MR. WESTBY:  The AHF bylaws which are in the

16  record.  The chairman has certain duties and may perform

17  other powers as may from time to time be assigned to him

18  by the board or prescribed by the bylaws.

19          The president has certain responsibilities and

20  duties subject to the control and direction of the board.

21  The president may delegate his responsibilities and

22  powers subject to the control of the board or these

23  bylaws.  We talked about Alfano as the treasurer who has

24  got very specific duties, books of account, financial

25  reports, deposit and disbursement of money and valuables.

```
1    Well, with respect to depositing money and other
2    valuables such depositories are only as may be designated
3    by the board and disbursements as may be ordered by the
4    board and other powers as prescribed by the board.  I
5    mean, it is all done with board authority.
6            And this gets back to this issue of standing
7    to bring the lawsuit because there was no control.  That
8    doesn't change standing.  This lawsuit has been brought
9    by AHF.  It has standing to claim its own property and to
10   seek an injunction to make sure that defendants no longer
11   dispose of or transfer or do anything else with that
12   property.  And that goes to the issues that we are here
13   about today.
14           Counsel stands before you and says our guys
15   haven't done anything since this lawsuit was filed.
16   Well, that is the problem.  I mean, all of these
17   behaviors were done without consulting the board, without
18   telling the board members, and, if a preliminary
19   injunction doesn't issue, AHF is at the mercy of whatever
20   they are going to do next.
21           And the fact that they did all of this, and he
22   talks about us not raising this 2017 merger in our
23   complaint or in our TRO, motion for TRO and our motion
24   for preliminary injunction, frankly, as we discussed, the
25   2017 merger agreement was a thing of the past.  If there
```

```
1   was going to be a merger with HIF, it had to go through

2   the board.  And so that is why a preliminary injunction

3   need issue.

4          Going back quickly to service, lawyers have

5   the same issues.  They got to run conflicts.  They got to

6   get authority to accept service.  Viktor Hammer accepted

7   service of the Florida lawsuit at his home.

8          THE COURT:  He was personally served, though.

9          MR. WESTBY:  He was personally served, but he did

10  not tell the process server to leave it at the door.

11         THE COURT:  But I think what counsel is saying is

12  he asked his lawyer to accept service on his behalf, and

13  that was denied.

14         MR. WESTBY:  It wasn't denied.  We said we would

15  get back to him and they personally served Viktor before

16  we responded, to be clear.

17         Talking about the e-mails because that goes to

18  the relief we have requested, counsel for defendant

19  stated that all of the e-mails were Hammer International

20  Foundation e-mails, but he also said Dave Smith's e-mails

21  were Hammer International Foundation.  And he stood here

22  and said Dave Smith was an Armand Hammer Foundation

23  employee.  Thus, the e-mails are Armand Hammer

24  Foundation, e-mails, regardless of what the e-mail

25  address would be because they were sent by an employee
```

1    doing business on behalf of the Armand Hammer Foundation.

2              He mentions that and took issue with the

3    lawsuit complaining about or alleging that his clients

4    were running around and stealing things, but AHF was

5    forced to file the lawsuit because they didn't know where

6    the assets were going.  They knew that they may be being

7    transferred, and so we sent a cease-and-desist letter on

8    November 9th, and the response was not a response to the

9    cease-and-desist letter.

10             They didn't say, no, we are doing this on

11   authority of the AHF board.  No.  Instead, they filed a

12   lawsuit in federal court that they didn't tell us about

13   and that they let sit until December 30th.  The federal

14   court lawsuit was filed two days after the

15   cease-and-desist letters were sent.  The letters were

16   sent on November 9th.  The lawsuit was filed on

17   November 11th.  No response to the cease-and-desist

18   letters was sent.  The lawsuit was then amended on

19   December 30th, and the first we learned of it were when

20   these papers were filed on January 4th.

21        THE COURT:  I must have misunderstood.  I thought

22   there were two lawsuits filed in Broward County state

23   court.  You are saying one of the two was actually filed

24   in the district court?

25        MR. WESTBY:  I'm sorry.  Broward County Court.  If

1    I misspoke, I apologize.

2         THE COURT:  You said federal court.

3         MR. WESTBY:  I'm sorry.  I apologize.  Both were

4    filed in Broward County.

5              And I should say the one that was amended and

6    attached to the papers as Exhibit 4 to Mr. Katofsky's

7    complaint amended on December 30th, that was the lawsuit

8    filed on November 11th to be clear, two days after the

9    cease-and-desist letters were sent.

10             One of the things I think counsel was asked is

11   why the Florida merger happened, and he said he didn't

12   know.  But, in his declaration, paragraph 3 says the

13   Florida merger was done to effectuate the 2017 merger.

14   And that is the presentation that has been given to this

15   Court and the position taken in the papers.

16             And we talked through it, of course, and I

17   don't need to walk you through why again.  That doesn't

18   show anywhere in the 2020 board meeting for the 2021

19   merger that that was done for the convenience of Michael

20   Hammer per the meeting minutes.  That says nothing about

21   the 2017 merger.

22        THE COURT:  I'm sorry to interrupt, but would you

23   mind addressing the point about if I were to issue an

24   injunction, whether that would prevent at least one

25   defendant from accessing personal property that doesn't

1   belong to the foundation but that belongs to the estate

2   of Mr. Hammer.

3       MR. WESTBY:  Look, Misty Hammer can get her

4   clothes.  We are happy to work that out and facilitate

5   her getting her personal possessions.  Whether there will

6   be dispute over what belongs to whom, I don't know.  We

7   haven't been provided an inventory of what the estate

8   claims is in the warehouse.

9       But as we have established today, that

10  warehouse belonged to the Armand Hammer Foundation, and

11  we are not laying claim over everything in it

12  necessarily, but the warehouse itself belongs to the

13  Armand Hammer Foundation.  And, look, as I said earlier,

14  we just want to make sure everything is accounted for,

15  and the proper process is followed.

16      If there is litigation about certain property,

17  that can happen, but, in the meantime, a preliminary

18  injunction should order so that, again, this property

19  can't be transferred elsewhere be disposed of another way

20  or something else happen without us knowing.

21      THE COURT:  I would like to minimize further

22  litigation over the contents of that warehouse.

23      MR. WESTBY:  So would we, Your Honor.

24      THE COURT:  Do you know what the value is of the

25  property, the real property?

```
 1          MR. WESTBY:  I don't, Your Honor, not standing

 2   here today.

 3          THE COURT:  Is there a mortgage on it?

 4          MR. WESTBY:  No.

 5          MR. KATOFSKY:  There isn't, Your Honor.

 6          THE COURT:  Thank you.

 7          MR. KATOFSKY:  I don't mean to interrupt.

 8          THE COURT:  I appreciate.  Do you know what the

 9   value of the property is?

10          MR. KATOFSKY:  Of the real estate?

11          THE COURT:  Yes.

12          MR. KATOFSKY:  As a real estate lawyer, I am going

13   to give you a pretty good estimate.  I would say it is

14   probably somewhere in the high seven digits, 7 to

15   8 million, I would say.  It is a valuable property, but I

16   will also tell you that the contents of the estate in the

17   building are close to equal of that number.

18          THE COURT:  Thank you.

19          Go ahead.

20          MR. WESTBY:  Nothing further from me, Your Honor.

21          MR. KATOFSKY:  I didn't mean to interrupt.  I

22   apologize.

23          THE COURT:  I caused it.

24          All right.  Thank you, everyone.

25          MR. KATOFSKY:  Your Honor, may I have one very
```

```
 1   quick point?
 2          THE COURT:  It has got to be quick.
 3          MR. KATOFSKY:  My concern, it has do with this
 4   issue.  There is going to be a probate filing I believe
 5   next week.  I am not handling it.  I don't get near
 6   estates and trusts.  This is going --
 7          THE COURT:  In Santa Barbara County?
 8          MR. KATOFSKY:  No.  LA.  Because he died in LA.
 9   It is going to be a very significant issue because the
10   majority of the assets of the estate are in that
11   building.
12          THE COURT:  You are going to need access to it is
13   what you are saying?
14          MR. KATOFSKY:  Yes.  And, quite frankly, almost
15   everything is going to come out of there because almost
16   nothing was for either foundation.
17          THE COURT:  If I obviously grant the injunction,
18   what I would propose is that the parties work to identify
19   assets belonging to the foundation versus the estate,
20   and, hopefully, there will be agreement which will
21   hopefully facilitate the probate.
22          MR. KATOFSKY:  Well, I hope you don't grant the
23   injunction for the reasons I stated.
24          THE COURT:  I understand.  But if I did.
25          MR. KATOFSKY:  If you do, we have given the
```

1    inventories to them.  They are part of the papers.  And

2    if it is not on those inventories, it is not the

3    foundation's.  It is Mr. Hammer's estate.  It is kind of

4    easy that way.

5            Thank you, Your Honor.

6        THE COURT:  Thank you.

7            Thank you, counsel.

8            This will stand submitted.  Obviously, we will

9    attend to this as soon as possible given the time

10   sensitivity.  Appreciate it.

11       (Pause in proceedings.)

12       THE COURT:  Back on the record.  I meant to raise

13   this, and I just forgot.  Have a seat.  You need to

14   comply with the local rules with respect to your filings,

15   and we require that documents be text searchable.  The

16   defense's documents were not which makes it hard for us

17   to look through them.  Okay.

18       MR. KATOFSKY:  Apologize.  That is beyond my

19   capabilities, but I am sure I have someone who knows how

20   to do that.

21       THE COURT:  Right.  Just make sure you get

22   familiar with the local rules because they will tell you

23   exactly what you need to do.

24       MR. KATOFSKY:  Apologize.

25       (Proceedings concluded.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              CERTIFICATE

2

3

4    I hereby certify that pursuant to Section 753, Title 28,

5    United States Code, the foregoing is a true and correct

6    transcript of the stenographically reported proceedings held

7    in the above-entitled matter and that the transcript page

8    format is in conformance with the regulations of the

9    Judicial Conference of the United States.

10   Date:  January 12, 2023

11

12    /s/ Katie Thibodeaux, CSR No. 9858, RPR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25